Thomas A. JOSEPH, Thomas J. Joseph, Acumark, Inc., and Airport Limousine and Taxi Service, Inc., Appellants

v.

The SCRANTON TIMES, L.P., The Times Partner, James Conmy, and Edward Lewis, Appellees.

Superior Court of Pennsylvania.

Argued July 10, 2013.

Filed March 11, 2014.

Reargument Denied May 13, 2014.

George Croner, Philadelphia, for appellants.

Kevin C. Abbott, Pittsburgh, for appellees.

BEFORE: MUNDY, J., OLSON, J., and STRASSBURGER, J.*

OPINION BY STRASSBURGER, J.:

Thomas A. Joseph (Joseph, Sr.), Thomas J. Joseph (Joseph, Jr.), Acumark, Inc. (Acumark), and Airport Limousine and Taxi Service, Inc. (Airport Limousine) (Appellants, collectively) appeal from the April 23, 2012 [1] judgment entered upon a non-jury verdict against Appellants and in favor of The Scranton Times, L.P. (Scranton Times), The Times Partner, James Conmy (Conmy), and Edward Lewis (Lewis) (Appellees, collectively) in this defamation action. We vacate the judgment; affirm in part and reverse in part the order denying Appellants' post-trial motions; and remand for further proceedings consistent with this opinion.

## I. Facts and Procedural History

A prior panel of this Court summarized the facts and history of this case as follows.

*FACTS*

The Internal Revenue Service Criminal Investigation Unit and the Pennsylvania State Police (PSP) Bureau of Criminal Investigation Division, Organized Crime Northeast Section, were conducting a joint investigation of William D'Elia, the reputed head of the Bufalino crime family of northeastern Pennsylvania. As part of the investigation, the federal agents and PSP troopers applied for search warrants for the homes and businesses of various associates of Mr. D'Elia. On May 29, 2001, the federal magistrate judge for the United States District Court for the Middle District of Pennsylvania issued search warrants that authorized, *inter alia*, the searches of the home of [Joseph, Sr.] and ... Acumark.[1] The search warrants were issued based on the affidavits of probable cause stating that a criminal conspiracy existed among Mr. D'Elia and others. The search warrants issued against Appell[ants] authorized the search and seizure of any documents or materials demonstrating violation of the federal racketeering and racketeer influenced corrupt organization (RICO) statutes, records relating to an illegal sports bookmaking operation, and records relating to the secreting of assets.[2]

[1] [Joseph, Sr.] was the sole shareholder of Appell[ant] Acumark.

[2] Specifically, the warrant permitted the search for evidence of interstate transportation in aid of racketeering enterprises (18 U.S.C. § 1952), illegal gambling (18 U.S.C. § 1955), money laundering (18 U.S.C. § 1956 & § 1957), and RICO (18 U.S.C. § 1962).

On May 31, 2001, federal agents and PSP troopers conducted searches of several businesses and individuals' homes pursuant to the search warrants, including the home of [Joseph, Sr.] and the office of ... Acumark. At approximately 8:00 a.m., twenty to thirty armed IRS agents and PSP troopers entered [Joseph, Sr.'s] home in suburban Wilkes–

* Retired Senior Judge assigned to the Superior Court.

1. The docket reflects that judgment was entered on April 19, 2012, but that notice was not sent to the parties until April 23, 2012.

Barre. The search lasted until approximately 3:00 p.m., and the seizure consisted of business and bank records of [Joseph, Sr.'s] businesses including ... Acumark.

Also on the morning of May 31st, approximately thirty armed federal agents executed the search warrant of ... Acumark's office in Wilkes–Barre. The agents seized ... Acumark's business records and records that involved [Joseph, Sr.'s] other business ventures.

The IRS agents and PSP troopers also executed search warrants at the homes of Mr. D'Elia and Jean Stanton and the home and office of Mr. Samuel Marranca. In addition, a search warrant was issued for the office of Raymond Zavada, who served as [Joseph, Sr.'s] personal and business accountant. The agents seized all of Mr. Zavada's files that related to [Joseph, Sr.] and his business ventures.

*The Newspaper Articles*

As a result of the execution of the search warrants on May 31st, the local news media began reporting news stories on June 1, 2001. The *Citizens' Voice,* a local newspaper in the Wilkes–Barre–Scranton area owned by Appell[ee] The Scranton Times LP, published ten news stories from June 1, 2001, through October 10, 2001, that involved [Joseph, Sr.] or ... Acumark. Appell[ee] Lewis, a *Citizens' Voice* staff writer, wrote or co-wrote the final eight articles. A brief summary of the articles follows.

On June 1, 2001, the *Citizens' Voice* published an article [authored by Conmy] headlined "Feds Raid Business in Pittston." The article reported that approximately thirty federal and state agents executed a federal search warrant at the office of ... Acumark. The article did not mention [Joseph, Sr.].

On June 2, 2001, the *Citizens' Voice* published an article headlined "Home of Acumark Owner Searched by Federal Agents." This article reported that federal agents searched [Joseph, Sr.'s] home. The article also reported that Michael Mey, Esquire, [Joseph, Sr.'s] attorney, confirmed that records were removed from ... Acumark's office. The article included Attorney Mey's statement that [Joseph, Sr.] did not know of any reason why a search warrant was served nor of any type of illegal activity at his home or business. Attorney Mey concluded by stating that he made requests to the IRS and Department of Treasury for information regarding the searches.

On June 5, 2001, the *Citizens' Voice* published an article [authored by Conmy and Lewis] headlined "Alleged Money-laundering Scheme Linked to Pittston Raid." The article reported that a source informed that "a money-laundering ring might have been the reason behind the federal search warrants issued last week." The article continued that "the 'three main players'. whose residences were searched ... allegedly were laundering money through Acumark ... and a limousine/taxi service." The article also reported that an unknown amount of money had been allegedly laundered in the 1990s through *The Metro,* a then-defunct newspaper, by buying fake advertisement space, and continued through ... Acumark after the sale of *The Metro.* The article reported that the search warrants were executed following months of video surveillance and a federal grand jury investigation. The article repeated that the federal agents searched the homes of Mr. D'Elia, [Joseph, Sr.], Ms. Stanton, and Mr. Marranca and the office of ... Acumark. The article also repeated that Attorney

Mey confirmed that business records were removed from ... Acumark's office but was unsure if records were removed from [Joseph, Sr.'s] home. The article also mentioned that records seized from an office at 1303 Wyoming Avenue, Exeter, involved *The Metro.* Appell[ees] published a picture of [Joseph, Sr.] with the article.

On August 5, 2001, the *Citizens' Voice* published an article [authored by Lewis and Conmy] headlined "Former Avoca Bar Target of Federal Money Laundering Probe." The article centered on an investigation into alleged prostitution and drug trafficking of Al Carpinet, Jr., at Lavelle's Pub. The article concluded with a recitation of the earlier articles involving the grand jury investigation of [Joseph, Sr.] The *Citizens' Voice* described the investigation as ongoing and stated that it had learned that federal authorities were focusing on a limousine and taxi service based at the Wilkes–Barre–Scranton and Lehigh Valley international airports as a means to transport money, drugs, prostitutes, and guns from Atlantic City, Philadelphia, and New York City.

Also, on August 5, 2001, the *Citizens' Voice* published an article [authored by Lewis] headlined "Firearms Dealer Denies Involvement in Alleged Money Laundering Scheme." The article centered on Gus Salazar, a Wyoming County firearms dealer, and stated that the PSP and Bureau of Alcohol, Tobacco, and Firearms, seized his firearms inventory. The article included Salazar's denial that he was involved with [Joseph, Sr.] or the money laundering. The article reported that Attorney Mey represented Salazar and [Joseph, Sr.]. The *Citizens' Voice* indicated that a "source said both Salazar and Joseph have an interest in the collection of firearms linking the two together to the federal

investigation." The article included Attorney Mey's response that [Joseph, Sr.] and Salazar were only connected by their retention of him for legal services.

On August 6, 2001, the *Citizens' Voice* published an article [authored by Lewis and Conmy] headlined "Probe Investigating Pub Clientele." The article reported the investigation into the alleged illegal activity of the patrons of Lavelle's Pub. The article also reported that a federal grand jury began receiving testimony about alleged money laundering at the beginning of the year and that the investigation widened to include prostitution, gun running, and drug trafficking. The article included a comment from a source who explained that IRS involvement began two years prior when the IRS received information that as much as $3 million had been laundered through *The Metro,* a newspaper formerly owned by [Joseph, Sr.]. The article also reported that several reliable sources stated that limousine services at two airports were being investigated for possibly transporting money, drugs, and firearms in attaché cases in trunks of the vehicles owned by the limousine services. The article continued that according to public records, [Joseph, Sr.] and his son, [Joseph, Jr.], owned and operated limousine and taxi services at the airports.

On August 8, 2001, the *Citizens' Voice* published an article [authored by Lewis] headlined "Ex–Metro Owner: I Didn't See Joseph Do Anything Wrong." The article included an interview that the *Citizens' Voice* conducted with Bob Butts, a former employee of [Joseph, Sr.] at *The Metro* who later purchased the paper from [Joseph, Sr.]. The article included Mr. Butts' praise of [Joseph, Sr.] and another former Metro employee's comment that he had knowledge of

*The Metro*'s subscriptions and revenues and was not aware that [Joseph, Sr.] did anything wrong. The article included the previous report of the May 31st searches and that [Joseph, Sr.], Mr. D'Elia, and Mr. Marranca were at the center of a federal grand jury investigation into money laundering. The article also included that Mr. D'Elia was a reputed mob boss of northeastern Pennsylvania. The article also stated that a source indicated that Mr. Marranca leased the office at 1303 Wyoming Avenue, Exeter.

On August 12, 2001, the *Citizens' Voice* published an article [authored by Lewis] headlined "Report: Judge Barrasse Linked to IRS Investigation." The article reported an allegation of a connection between Judge Barrasse and the investigation into the clientele at Lavelle's Pub. The article indicated that the same grand jury that was investigating drug activity of the patrons at Lavelle's Pub was investigating money laundering allegations. The article continued with an accounting of the drug trafficking at Lavelle's Pub, which was shut down in 1997 following an investigation into drug trafficking that, in turn, led to the arrest of twenty people in 1998, and the investigation of the laundering of the drug proceeds. The article concluded with a summation of its earlier reports on the May 31st searches of ... Acumark's office and of the homes of [Joseph, Sr.], Ms. Stanton, Mr. D'Elia, and Mr. Marranca, including the fact that agents seized records pertaining to *The Metro* from the office at 1303 Wyoming Avenue in Exeter.

On August, 20, 2001, the *Citizens' Voice* published an article [authored by Lewis] headlined "Federal Probe Expanding to Examine Political Corruption." The article reported the allegations of illegal activity at Lavelle's Pub

and on the part of Al Carpinet. The article also mentioned the May 31st searches of ... Acumark's office and that a federal grand jury had been receiving testimony regarding alleged money laundering through *The Metro* and ... Acumark.

On October 10, 2001, the *Citizens' Voice* published an article [authored by Lewis] headlined "3 Witnesses Subpoenaed in Money-laundering Investigation." The article began with a statement that a federal grand jury had subpoenaed three additional witnesses and that eight people had been arrested as the result of a state grand jury investigation into the allegedly illegal activities at Lavelle's Pub. The article recapped its previous reports involving the May 31st searches of and investigation into the alleged money laundering operation through *The Metro* and ... Acumark and noted that government agents found Metro records during the search of the office leased to Mr. Marranca at 1303 Wyoming Avenue, Exeter. The article also reported that a source indicated that the money allegedly laundered through *The Metro* "came from overfill and the selling of open airspace at several Pennsylvania landfills." The article stated a source said, "This investigation took off since May 31," which was the date of the searches of Appell[ants].

[The records seized from Appellants were eventually returned to Appellants, with the government's request that Joseph, Sr. release the government from liability. When an indictment ultimately was handed down by the grand jury, neither any of Appellants, nor any of Joseph, Sr.'s other businesses such as *The Metro*, was mentioned.]

*PROCEDURAL HISTORY*

On May 22, 2002, Appell[ants] commenced a defamation action against Appell[ees] pursuant to 42 Pa.C.S.A. §§ 8341–8345 (Uniform Single Publication Act). The complaint asserted various claims for defamation-libel and invasion of privacy based upon ten articles published in the *Citizens' Voice*.[14]

[14] The plaintiffs originally included [Joseph, Jr.], Airport Limousine . . ., and Airport Taxi, Limousine and Courier Service of Lehigh Valley, Inc. Prior to trial, Acumark, Airport Limousine . . ., and Airport Taxi, Limousine and Courier Service of Lehigh Valley, Inc. withdrew their invasion of privacy claims.

The defendants originally included Edward J. Lynett, Jr., George V. Lynett, Cecelia Lynett Haggerty, The Scranton Times, Inc., Shamrock Communications, Inc., ZYXW, Inc., and James Conmy. Prior to trial, the parties stipulated to the dismissal of all claims against these defendants.

Following the conclusion of discovery, Appell[ees] filed a motion for summary judgment. On January 5, 2004, the trial court denied the summary judgment motion. An eight-day non-jury trial commenced on May 16, 2006, and concluded on May 26, 2006. At the close of Appell[ant]s' case-in-chief, Appell[ee]s made a motion for directed verdict. The trial court granted the motion as to all claims made by [Joseph, Jr.] At the conclusion of Appell[ee]s' defense, Appell[ee]s renewed the motion for directed verdict. The trial court denied the motion. On October 27, 2006, the trial court entered its verdict in favor of Appell[ant]s on the defamation action against Appell[ee]s.[15] The trial court concluded that eight of the articles (collectively Defamatory Articles) defamed Appell[ant]s by either directly or implicitly indicating that Appell[ant]s were engaged in a broad range of criminal enterprises uncovered by an investigation when in fact the investigation targeted other individuals and businesses. In arriving at this conclusion, the trial court found that Appell[ant]s were private figures, that Appell[ant]s proved that the Defamatory Articles were false, and that Appell[ant]s proved that Appell[ee]s published the Defamatory Articles with want of reasonable care and diligence to ascertain the truth. The trial court awarded to [Joseph, Sr.] compensatory damages in the amount of $2 million and to . . . Acumark compensatory damages in the amount of $1.5 million.

[15] The trial court also entered a verdict in favor of the defendants as to [Joseph, Sr.'s] invasion of privacy claim, as to all [Appellants'] claims for punitive damages, and as to the defamation claims of Airport Limousine . . ., and Airport Taxi, Limousine and Courier Service of Lehigh Valley, Inc.

*Joseph v. Scranton Times L.P.*, 959 A.2d 322, 328–333 (Pa.Super.2008) (some footnotes and citations omitted).

Following denial of their post-trial motions, Appellees appealed to this Court, and we affirmed the judgment. *Id.* However, our Supreme Court vacated the judgment, verdict, and all substantive orders, based upon the appearance of judicial impropriety in the assignment and trial of the case in Luzerne County, and remanded the case for a new trial. *Joseph v. Scranton Times L.P.*, 604 Pa. 677, 987 A.2d 633 (2009).

Back in the Court of Common Pleas of Luzerne County, the case was assigned to the Honorable Joseph Van Jura. Judge Van Jura entertained motions for summary judgment, which resulted in the dismissal of the false light/invasion of privacy claims of Acumark and Airport Limousine.[2] A non-jury trial on the remaining claims was held in May 2011; Judge Van

2. Summary judgment was also granted to defendants not relevant to this appeal, and the caption was amended to reflect their dismissal from the case.

Jura entered a verdict in favor of Appellees and against Appellants on all remaining claims, and an opinion in support, on December 8, 2011. By order of December 9, 2011, Appellants' deadline for filing post-trial motions was extended to January 9, 2012.

Appellants timely filed post-trial motions, seeking judgment notwithstanding the verdict (JNOV) as to damages, or a new trial as to damages. Meanwhile, Judge Van Jura's term had expired, and the case was re-assigned to the Honorable Lesa S. Gelb. Judge Gelb denied Appellants' post-trial motions by order of March 19, 2012. Notice of the entry of judgment was served on the parties on April 23, 2012, and Appellants filed a timely notice of appeal. Judge Gelb did not order Appellants to file a concise statement of errors complained of on appeal, but filed an opinion on June 1, 2012, indicating that the issues giving rise to the appeal are addressed in Judge Van Jura's opinion of December 8, 2011.

## II. Issues on Appeal and Applicable Law

Appellants present the following questions for this Court's consideration, which we have renumbered for ease of disposition.

I. Whether the trial court's stated bases (including credibility determinations) for rejecting an award of general damages to [Appellants] in connection with their claims for defamation misapply the law, are manifestly unreasonable, and capriciously disregard competent evidence resulting in an error of law and/or an abuse of discretion?

II. Whether the trial court erred as a matter of law in concluding that the *Citizens' Voice*'s publications asserting that a taxi and limousine service owned by Joseph, Sr. and Joseph, Jr. was used as a means to transport money, drugs, prostitutes, and guns to and from other locations are not statements "of and concerning" Joseph, Sr. justifying the denial of any award of general damages?

III. Whether the trial court's errors of law and manifestly unreasonable and capricious disregard of [Appellants'] competent evidence of damages vitiates [*sic*] its failure to substantively consider (a) [Appellants'] claims for punitive damages, and (b) the individual [Appellants'] claims for false light/invasion of privacy?

IV. Whether the trial court's failure to consider that [Appellants] proved actual malice and an entitlement to presumed damages constitutes an error of law?

V. Whether the trial court's failure to award special damages to [Acumark] is against the weight of the evidence and constitutes an abuse of discretion?

Appellants' Brief at 2–3 (trial court answers omitted).

We consider Appellants' questions mindful of the following.

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or

if its findings are premised on an error of law.

We will respect a trial court's findings with regard to the credibility and weight of the evidence unless the appellant can show that the court's determination was manifestly erroneous, arbitrary and capricious or flagrantly contrary to the evidence.

*J.J. DeLuca Co., Inc. v. Toll Naval Associates,* 56 A.3d 402, 410 (Pa.Super.2012) (internal quotations and citations omitted).

■ In their post-trial motions, Appellants sought JNOV or, in the alternative, a new trial. Our standard of review for the denial of each is as follows.

A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the [court] could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

Our review of the trial court's denial of a new trial is limited to determining whether the trial court acted capriciously, abused its discretion, or committed an error of law that controlled the outcome of the case. In making this determination, we must consider whether, viewing the evidence in the light most favorable to the verdict winner, a new trial would produce a different verdict. Consequently, if there is any support in the record for the trial court's decision to deny a new trial, that decision must be affirmed.

*Grossi v. Travelers Personal Ins. Co.,* 79 A.3d 1141, 1147–1148 (Pa.Super.2013) (quoting *Wilson v. Transp. Ins. Co.,* 889 A.2d 563, 568–569 (Pa.Super.2005)).

■ A brief summary of the applicable principles of defamation law is as follows.

Defamation is a communication which tends to harm an individual's reputation so as to lower him or her in the estimation of the community or deter third persons from associating or dealing with him or her.... In a defamation case, a plaintiff must prove: (1) The defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion.

*Moore v. Cobb–Nettleton,* 889 A.2d 1262, 1267 (Pa.Super.2005) (internal quotations and citations omitted). *See also* 42 Pa.C.S. § 8343(a) (providing elements of the cause of action).

■ Because the defendants in this case are members of the media, Appellants bore additional burdens of proof. "If the statement in question bears on a matter of public concern, or the defendant is a mem-

ber of the media, First Amendment concerns compel the plaintiff to prove, as an additional element, that the alleged defamatory statement is in fact false." *Lewis v. Philadelphia Newspapers, Inc.,* 833 A.2d 185, 191 (Pa.Super.2003). "If the plaintiff is a public official or public figure, [he or] she must prove also that the defendant, in publishing the offending statement, acted with actual malice, *i.e.* with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *Id.* (internal quotations omitted).

Regarding the damages elements of Appellants' claims, proof of the "special harm" required to be shown under 42 Pa. C.S. § 8343(a)(6) varies depending upon the type of defamatory statement at issue. For cases of libel,[3] Pennsylvania has adopted the provision of the Restatement (Second) of Torts which provides: "[o]ne who falsely publishes matter defamatory of another in such a manner as to make the publication a libel is subject to liability to the other although no special harm results from the publication." Restatement (Second) of Torts § 569; *see also Agriss v. Roadway Exp., Inc.,* 334 Pa.Super. 295, 483 A.2d 456, 473 (1984) (adopting section 569). Thus, although the statute indicates that "special harm" must be proven, our courts have held that a libel plaintiff need not prove "special harm."

This apparent contradiction is resolved by understanding that the term "special harm" has different meanings in the statute and Restatement. The term "special harm" as used in the statute has been interpreted to mean "general damages" which are proven upon a showing of "actual harm." "Actual harm includes 'impairment of reputation and standing in the community, ... personal humiliation, and mental anguish and suffering.'" *Brinich v. Jencka,* 757 A.2d 388, 397 (Pa.Super.2000) (quoting Restatement (Second) of Torts § 621, Comment b.).

As used in section 569 of the Restatement, the "special harm" that a libel plaintiff need not show is actually "special damages." "Special damages" are "economic harm" or "pecuniary loss." *Pilchesky v. Gatelli,* 12 A.3d 430, 444 (Pa.Super.2011). *See also* Restatement (Second) of Torts § 575, Comment b. ("Special harm, as the words are used in this Chapter, is the loss of something having economic or pecuniary value.").

Therefore, in order to satisfy the "special harm" element of a defamation claim, a libel plaintiff need only show "actual harm" to establish "general damages." A libel plaintiff need **not** show "special damages" to satisfy the statutory burden of proving "special harm."[4]

---

3. It is clear that Appellants have claimed libel, as opposed to slander, as the statements were published in the form of printed words. *See* Restatement (Second) of Torts § 568("(1) Libel consists of the publication of defamatory matter by written or printed words.... (2) Slander consists of the publication of defamatory matter by spoken words...."). While slander actions usually require proof of special harm, slander *per se* requires only proof of actual harm. *See* Restatement (Second) of Torts §§ 570–574. Accordingly, precedent addressing slander *per se* claims is applicable to the instant case.

4. The Restatement defines general and special damages as follows.

(1) "General damages" are compensatory damages for a harm so frequently resulting from the tort that is the basis of the action that the existence of the damages is normally to be anticipated and hence need not be alleged in order to be proved.

(2) "Special damages" are compensatory damages for a harm other than one for which general damages are given.

Restatement (Second) of Torts § 904.

## III. Discussion

Acknowledging all of the above elements of Appellants' cause of action, *see* Trial Court Opinion (TCO), 6/1/2012, at 10–12, 22–24, the trial court found that Appellants each failed to meet the burden of proof as to actual harm. *Id.* at 25–35. Accordingly, the trial court entered its verdict in favor of Appellees.

Appellants argue that the only proof the trial court found lacking was proof of damages, and that the trial court's opinion shows that it made factual findings in Appellants' favor as to Appellees' liability. Appellants' Brief at 38–41. Appellants further claim that the evidence showed actual harm, and, even if it did not, they were entitled to presumed and punitive damages because they proved actual malice. Therefore, Appellants argue, the case should be remanded for a new trial on the issue of damages alone. *Id.* at 70.

Conversely, Appellees argue that the trial court, finding no actual harm, ended its inquiry there and made no findings as to the other elements of Appellants' causes of action. Appellees' Brief at 63–69. Accordingly, Appellees argue, if this Court concludes that the trial court erred in finding that Appellants failed to prove damages, the case must be remanded for a new trial on liability and damages issues.

After thorough review of the parties' briefs and the record, we conclude the following: (A) the trial court determined that Appellants met their burden of proof as to all elements except damages; (B) the trial court's conclusion that Appellants failed to prove general damages, *i.e.* actual harm, is based upon misapplication of the law; (C) the trial court erred in failing to make a factual finding on whether Appellees published the articles with actual malice; (D) the trial court erred in dismissing Appellants' false light claims for want of proof of damages; and (E) the trial court's rejection of Acumark's special damages claim is supported by the record and is not against the weight of the evidence. Our reasons for these holdings follow.

### A. The Trial Court Found that Appellants Established Appellees' Liability for Defamation

■ From our review of the record, there is no question that Appellees published the articles, that they contained statements that were defamatory *per se*, and that all who received the publication understood the defamatory meaning.

■ "Whether a communication can be construed to have a defamatory meaning is a question of law for the court to determine." *Cashdollar v. Mercy Hosp. of Pittsburgh*, 406 Pa.Super. 606, 595 A.2d 70, 75 (1991). Here, Appellees reported, *inter alia*, that Joseph, Sr. had received a target letter from the Department of Justice and was the subject of video surveillance; Joseph, Sr. used Acumark, Airport Limousine, and *The Metro* to launder money; Airport Limousine, operated by Joseph, Sr. and Joseph, Jr., was involved in transporting money, drugs, prostitutes, and guns; and Joseph, Sr. and Acumark were connected to drug trafficking at Lavelle's Pub and were involved in political corruption. *See* TCO, 6/1/2012, at 20 n. 13.

■ "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559. It is beyond dispute that attributing the criminal activity detailed above to a plaintiff constitutes defamation. *See, e.g.,* Restatement (Second) of Torts § 569 at Comment d. ("An imputation of crime in libelous form is a common type of defamation."); *see also Cosgrove Studio & Cam-*

*era Shop, Inc. v. Pane,* 408 Pa. 314, 182 A.2d 751, 754 (1962) ("[A]ny language which unequivocally, maliciously and falsely imputes to an individual or corporation want of integrity in the conduct of his or its business is actionable."). Each of the offending articles was defamatory on its face, and required no extrinsic evidence of defamatory meaning.

The trial court did find that the defamatory meaning of the articles was understood by its recipients. *See, e.g.,* TCO, 6/1/2012, at 20 n. 13 (noting that the articles implied to the average *Citizens' Voice* reader that, *inter alia,* Joseph, Sr. was sent a target letter and had been the subject of video surveillance). Indeed, there is no non-defamatory meaning any recipient could have ascribed to the claims that Appellants were involved in money laundering, drug trafficking, political corruption, and the other criminal activity alleged.

Contrary to Appellees' argument, *see* Appellees' Brief at 66–69, the trial court opinion shows that it found that the defamatory statements were false, and that they were not protected by the fair report privilege. In the context of its analysis of whether Appellants were public figures for First Amendment purposes, the trial court specifically addressed Appellees' privilege argument and offered the following discussion indicating its finding that the investigation Appellees reported never happened.

The evidence presented at trial showed that Joseph, Sr., had an acquaintance with William D'Elia, the reputed head of the local mafia, for nearly 30 years, principally through the interaction of his children and the D'Elia children. Joseph, Sr.'s family and D'Elia's family became friends. The evidence at trial also indicated that D'Elia secured some printing jobs for Acumark and an illfated organ transplant service known as "Heaven Sent[,"] that operated for a short period of time. D'Elia was never shown to have had any ownership interest in Acumark. D'Elia has never been an officer in Acumark, occupied an office at Acumark, or had access to any automobile provided by Acumark. The trial evidence further indicated that, in the 1990[s], Joseph, Sr., distanced himself from D'Elia. This lengthy estrangement was corroborated by Jeanne Stanton, D'Elia's girlfriend for the past thirty-some years, who testified in February 2011 that Joseph, Sr.'s relationship with D'Elia has been estranged for more than twenty years and they have not spent time with each other socially since the 1980s. . . . Although Joseph[, Sr.'s] house and . . . Acumark's business location were searched at the same time as D'Elia's house was searched, there was no credible evidence presented at trial linking the two men beyond being social acquaintances of varying degrees over time. Significantly, in the [trial c]ourt's view, when D'Elia was indicted in May, 2006, the indictment contained no reference to [Joseph, Sr.] or to any of his businesses.

\* \* \*

In viewing the specific public controversy that [Appellees] contend involved [Appellants], the evidence at trial showed only that [Appellants], along with several others, were subjected to searches executed pursuant to warrant. That particular incident . . . was over in a day. The evidence at trial also showed that the records seized from [Appellants] were ultimately returned in conjunction with the government requesting that . . . Joseph, Sr., execute a release from potential liability.

A few months after the searches, [Appellants'] accountant[, Raymond Zavada] testified before the [g]rand [j]ury, an

event which drew no comment from ... the Citizens' Voice.... At the 2006 trial, the accountant stated: (i) that he was never asked about either of ... Joseph, Sr.'s airport transportation businesses while in the grand jury; (ii) that he didn't recognize any of the company names posed to him as having any dealings with Acumark; (iii) that he had never seen any documentation linking Acumark to any of these companies; and (iv) that he was never again contacted by the government after the single grand jury appearance. Parenthetically, accountant Zavada also was not asked about drugs or drug trafficking, guns or gun running, or prostitutes or prostitution.

No employee of Acumark or any of Joseph, Sr.'s other businesses was summoned before the grand jury, nor were any of the tax returns filed by Acumark, Airport Limousine[, or Joseph, Sr.'s other taxi business, ATLC] ever audited by the Internal Revenue Service. Neither [Airport Limousine] nor ATLC was ever searched, and no evidence was presented at trial that [Appellants] had any involvement with a drug ring at a local pub, or with political corruption, or with prostitution, or with drug trafficking, or with money laundering.

Thus, based on the evidence admitted at trial, [the trial c]ourt finds that the public controversy alleged by [Appellees], aside from the initial searches, was largely created by [Appellees'] own publications.... [T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure. No credible evidence was offered at trial demonstrating that any of the defamatory statements published by the *Citizens' Voice* concerning [Appellants], after reporting the initial searches of Acumark and Joseph, Sr.'s home, [was]

true. [Appellees] cannot create a broader investigation, insufficiently supported by evidence at trial and rely upon that investigation to furnish the public controversy that they now claim requires [Appellants'] characterization as public figures.[13]

_____

[13] [Appellees] argued at trial that the articles did not accuse [Appellants] of crimes, but simply reported on a government investigation. However, while the appearance before the grand jury of [Appellants'] accountant went unreported in the *Citizens' Voice*, there was no credible evidence admitted at trial that the government was conducting an investigation that embraced the elements and events that were reported in the *Citizens' Voice*. For example, there was no evidence that Joseph, Sr., had ever been sent a target letter, as clearly implied to the average reader of the *Citizens' Voice*; no evidence that Joseph, Sr., had ever been the subject of video surveillance, as clearly implied to the average reader by the *Citizens' Voice*; no evidence that [Appellants] had any connection to the local pub that was a focal point of a local drug ring; no evidence that Joseph, Sr.'s airport transportation businesses were being investigated for drug trafficking, prostitution, gun running or money laundering; no evidence that any of [Appellants] ever [was] under investigation for political corruption; and no evidence that any [Appellant] was in imminent danger of being indicted. When an indictment was handed down, in May 2006, by the grand jury that [Appellees] contend was conducting the investigation upon which [Appellees] were reporting in the articles, that indictment never mentioned [Appellants] or any of Joseph, Sr.'s other businesses.

TCO, 6/1/2012, at 17–20 (citations and quotation marks omitted).

Therefore, having determined that the investigation did **not** encompass the "elements and events" related to Appellants, *id.* at 20 n. 13, the trial court necessarily found to be false the reports of the *Citizens' Voice* that Appellants **were** being investigated for that alleged criminal activity.

This finding is supported by the record. *See id.* (citing to evidence of record). Further, Appellants offered the only evidence they could to prove the negative: their own testimony that they had not been investigated for, or committed, the criminal acts alleged. *See, e.g.,* N.T., 5/2–13/2012, at 505–508 (Joseph, Sr. testifying that neither he nor any of his businesses ever received a target letter from any federal grand jury; that no airport transportation business of his ever transported money, drugs, guns, or prostitutes; and that he was never investigated about such transportation); ·*id.* at 509 ("I was 100 percent innocent. Everybody in my family was 100 percent innocent. The companies were totally free of all of these things."). In addition to the indictment's failure to reference any of Appellants, as this Court's independent review in the prior appeal of the application and affidavits for the search warrants revealed, the investigation that was the subject of the *Citizens' Voice* articles did not encompass the following, contrary to the reports of Appellees: that Joseph, Sr. was the subject of video surveillance; that drug trafficking was operated from Lavelle's Pub; or that there was any link between Appellants and Lavelle's Pub. *Joseph,* 959 A.2d at 336.

Finally, the trial court clearly recognized that Appellants bore the burden of proving falsity. TCO, 6/1/2012, at 12 (citing, *inter alia, Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986)). Had the trial court not made the factual finding that Appellants satisfied their burdens of proof as to liability, it would not have had the occasion to reach the question of whether Appellants suffered damages as a result of the defamation.

Accordingly, we conclude that, in rendering its verdict in favor of Appellees, the only proof the trial court found lacking from Appellants was that of damages caused by Appellees' libel.

**B. The Trial Court Committed Errors of Law in Considering Appellants' Proof of Damages**

Upon our review of the record as to the damages issues, accepting the trial court's factual findings and credibility determinations as we must, we nonetheless are constrained to conclude that the trial court's verdict of zero damages is based upon errors or misapplications of the law. We address the errors *seriatim.*

**1. General Damages Include Emotional Distress, Mental Anguish, and Personal Humiliation in Addition to Harm to Reputation**

The trial court explains in its opinion that Joseph, Sr. failed to meet his burden of proof as to general damages (actual harm) because it did not believe his or his daughter's testimony about the harm to Joseph, Sr.'s reputation, *id.* at 26 (indicating it found the testimony of Joseph, Sr. and Leah Joseph incredible); and because Joseph, Jr. offered no testimony that the harm to his reputation was caused by the defamatory statements, *id.* at 28 (indicating that, while there was testimony that Joseph, Jr. stopped using his last name in public and that friends of his fiancé pulled away when his name was mentioned, there was no evidence that this was caused by Appellees' defamatory statements).

However, in addition to evidence of reputational harm, "personal humiliation and mental anguish are types of actual harm ... compensable for defamation." *Pilchesky,* 12 A.3d at 444. *See also Brinich,* 757 A.2d at 397 (quoting Restatement (Second) of Torts § 621, Comment at b.); 50 Am.Jur.2d Libel and Slander § 358 ("[G]eneral damages ... represent such

effects of the defamation as ... shame, mortification, and hurt feelings[.]").

Appellants offered the following evidence of personal humiliation and mental anguish suffered by Joseph, Sr. and Joseph, Jr. Leah Joseph, daughter of Joseph, Sr., testified that the articles caused her to refuse to recognize her father in public, which "killed him." N.T., 5/2–13/2011, at 1297. She further testified that Joseph, Sr. was "distressed" by the defamatory statements, *id.* at 1292; that since their publication it has been "the lowest I've ever seen him," *id.* at 1304; and that "it's hard for him to keep going," *id.*

Joseph, Sr. testified to the "emotional pain" it caused him to know that his daughter was ashamed of him. *Id.* at 1278. He testified that the treatment his school-age children received following publication of the articles "broke my heart." *Id.* at 509.

Joseph, Jr. testified to the following in relation to being labeled "a drug dealer, a gunrunner, a gangster, someone who's involved with prostitutes": "It's humiliating. It's embarrassing. It's degrading. It's depressing...." *Id.* at 1380–1381. When asked how the articles affected his father, Joseph, Jr. testified "take everything I just said and multiply it by ten. That's how it affected him." *Id.* at 1381.

The trial court does not indicate that it found this testimony incredible.[5] Rather, the trial court ignored it completely, focusing solely on the question of reputational damage. Returning a verdict in favor of Appellees without even considering this evidence of general damages (*i.e.,* emotional distress, mental anguish, and personal humiliation) constrains us to conclude that the trial court erred, and a new trial as to

damages is warranted. *See McCloud v. McLaughlin,* 837 A.2d 541, 546 (Pa.Super.2003) (quoting *Gottlob v. Hillegas,* 195 Pa.Super. 453, 171 A.2d 868, 870 (1961)) ("[W]e are justified in declaring the lower court guilty of ... an abuse of discretion [in denying a motion for a new trial] only if we are clearly convinced by the record that the [finder of fact] was influenced by ... some misconception of the law or the evidence.").

**2. Appellants Were Not Required to Prove that the Defamatory Statements Were the Sole Cause of the Damage to Their Reputations**

The trial court in its opinion referred repeatedly to Appellants' failure to prove that reputational harm was caused **solely** by the defamatory statements and not by the fact, truthfully reported in the *Citizens' Voice* and elsewhere, that Joseph, Sr. and Acumark were subject to a search as part of an investigation into alleged money laundering and connections to organized crime. TCO, 6/1/2012, at 27 ("[Appellants] offered no testimony from any member of Joseph[, Sr.'s] community that Joseph, Sr.'s reputation was **only** damaged by the references to an investigation into the alleged transportation of drugs, guns and prostitutes ...") (emphasis added); *id.* at 28 ("Neither Joseph, Sr. nor Leah Joseph, proved that the alleged loss of social enjoyment was specifically and solely attributable to the allegedly false and defamatory statements complained of in the *Citizens' Voice* articles....") (emphasis added); *id.* ("Joseph, Jr. did not meet his burden of showing ... that he suffered general damages in the form of a diminished reputation solely as a result of the

---

5. While the trial court did indicate that it found incredible the testimony that the defamatory *Citizens' Voice* articles, as opposed to "something else," such as the truthful articles, caused the harm to Appellants' reputations, TCO, 6/1/2012, at 26, it said no such thing about the testimony concerning personal humiliation.

single statement about him in the *Citizens' Voice* articles.") (emphasis added); *id.* at 30 ("Neither Acumark nor Airport Limousine introduced any evidence to show that its reputation was impacted solely by the later *Citizens' Voice* articles, and not the first two articles showing Acumark was the subject of a federal raid which resulted in the seizure of its business records....") (emphasis added).

Appellants argue that they were not required to do so in order to recover. Appellants' Brief at 54 ("The trial court implicitly concedes that Joseph, Sr.'s reputation was damaged by the Articles; just not, in the trial court's view, only by the articles") (emphasis omitted). We agree with Appellants that the trial court misapprehended the law on causation.

The finding that there were other causes for the damage to Appellants' reputations certainly impacts the quantity of the damages for which Appellees are liable; however, that does not negate liability. "For the defamation to be a legal cause of the ... harm, it is necessary that it be a substantial factor in bringing about the harm.[6] ... **It is not necessary, however, that the defamation be the sole cause of the ... harm,** so long as it has played a substantial part in bringing it about."[7] Restatement (Second) of Torts § 622A at Comment b (emphasis added).

Accordingly, the trial court abused its discretion in denying Appellant's motion for a new trial because the verdict was based upon misapplication of the law. *See McCloud,* 837 A.2d at 546. Upon retrial, the fact finder must determine whether each of the four Appellants suffered harm to his or its reputation for which the defamatory statements in the *Citizens' Voice* articles were substantial causal factors.

3. **The Trial Court Should Have Considered Whether Joseph, Sr.'s Reputation Was Harmed by the *Citizens' Voice* Articles Reporting Airport Limousine's Involvement in Illegally Transporting Money, Drugs, Guns, and Prostitutes, Because the Articles are "Of and Concerning" Joseph, Sr.**

 The *Citizens' Voice* began reporting in August 2001 that the government investigation which had resulted in Acumark's office and Joseph, Sr.'s home being searched, included not only alleged illegal activity related to Lavelle's Pub and money laundering through Joseph, Sr.'s *The Metro,* but also suspicion that limousine services operating at two airports were transporting money, drugs, guns, and prostitutes to Atlantic City, Philadelphia, and New York. The article specifically identified Joseph, Sr. and Joseph, Jr., by name, as owners of limousine and taxi services at the two airports, and indicated that, although the services promote limousines, they have none. *See* Edward Lewis and James Conmy, *Probe Investigating Pub Clientele,* CITIZENS' VOICE, 8/06/2001.

The trial court held this article was not "of or concerning" Joseph, Sr., and therefore rejected Joseph, Sr.'s claim that his reputation was damaged by the article. As the trial court explained,

> Joseph, Sr. claims that the "real harm" to his reputation occurred to him after the August articles which stated that an

---

6. As discussed in section II *supra,* the statutory element of proof of "special harm" is satisfied, in a libel action, upon showing of actual harm, or general damages. *Agriss,* 483 A.2d at 473.

7. This comports with the standard applicable to other torts. *See, e.g.,* Restatement (Second) of Torts § 431 ("The actor's negligent conduct is a legal cause of harm to another if ... his conduct is a substantial factor in bringing about the harm....").

airport limousine business was being investigated for transporting drugs, guns and prostitutes. The *Citizens' Voice* articles never reported that Joseph, Sr. was under investigation for these activities, or that he was personally involved in any of this alleged activity, and Joseph, Sr. cannot properly base a claim for reputational damages on statements that do not apply to him and are not actually about him.

TCO, 6/1/2012, at 26. However, in discussing its finding that Joseph, Jr. failed to prove damages, the trial court stated "Joseph, Jr. did not bear his burden of proof that the sole statement in the *Citizens' Voice* articles that was actually about him diminished his reputation in the community. . . ." *Id.* at 28. In an apparent contradiction, the trial court did not find that the article was not "of or concerning" Joseph, Jr.

The conclusion that the defamatory statements included in the August 6 article are not of and concerning Joseph, Sr. is not only inconsistent with the trial court's determination as to Joseph, Jr., but it is also based upon a misapplication of the law. The trial court correctly notes that a defamed party does not have to have been named specifically in order to recover. TCO, 6/1/2012, at 11. "If the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them or [otherwise] creates a defamatory implication . . . he may be held responsible for the defamatory implication. . . ." *Id.* (quoting Prosser, THE LAW OF TORTS, § 116 (5th ed. 1984 & Supp. 1988)). *See also* 50 Am. Jur.2d Libel and Slander § 335 ("[T]he libel of a corporation may support an action by an officer of a corporation if reasonable readers would understand it to charge the individual with the same conduct as the corporation.").

Here, reporting that the airport businesses were being investigated for illegally transporting money, drugs, and guns, and then naming Joseph, Sr. and Joseph, Jr. as the owners of the business, particularly in the context of an article reporting that Joseph, Sr.'s other business had laundered money, clearly implies that the Josephs are involved in the airport businesses' criminal activity. *Compare Volomino v. Messenger Pub. Co.*, 410 Pa. 611, 189 A.2d 873, 874 (1963) ("Words criticizing a corporation, without more, are not defamatory of a person connected with it[.]"), *with Medure v. Vindicator Printing Co.*, 273 F.Supp.2d 588, 619 (W.D.Pa.2002) ("In this case, however, Medure was mentioned by name and identified as the president of Gaming World.").

Therefore, to the extent that the trial court failed to consider whether the August 2001 articles damaged Joseph, Sr.'s reputation, it erred. This is particularly important because the trial court found that Joseph, Sr.'s testimony about the effect that the articles had on his social life was incredible, as it was contradicted by the testimony he gave in relation to an automobile accident case. *See* TCO, 6/1/2012, at 25 ("Joseph, Sr. admitted . . . that in a deposition on July 11, 2001, in the middle of the time period when the [a]rticles were published by the *Citizens' Voice*, that he testified under oath that it was the accident that had caused him to cease socializing and that the accident had caused him to stop attending parties. In his accident case, Joseph, Sr. never mentioned the *Citizens' Voice* articles as the cause of his harm.") (citation omitted).

Joseph, Sr.'s deposition testimony was given in July 2001: before the *Citizens' Voice* published the money-drugs-guns-prostitutes article. Accordingly, the factual determination that the August 2001 article caused no damages is unsupported by

the record to the extent that it is based upon Joseph, Sr.'s failure to attribute causation to an article that had not been published yet.

### C. The Question of Actual Malice Was Relevant Even in the Absence of an Award of Compensatory Damages

As noted above, if a defamation plaintiff is a public figure, he or she must prove that the defendant published the defamation with actual malice. *Lewis,* 833 A.2d at 191. The trial court held that none of the Appellants was a public figure or limited purpose public figure. *See* TCO, 6/1/2012, at 15–16. Accordingly, the trial court concluded that Appellants were not required to prove actual malice in order to recover. *Id.* at 21. Therefore, the trial court made no factual finding as to whether Appellees published the defamatory articles with knowledge of their falsity or reckless disregard for whether the statements were false.

Appellants, while agreeing that they were not obligated to prove actual malice, argue that they did in fact prove it, and that the trial court erred in failing to make a finding on this issue. Appellants' Brief at 66–68. Appellants claim that proof of actual malice permits the fact-finder to award (1) punitive damages and (2) presumed damages. We agree.

### 1. Punitive Damages May Be Awarded Upon a Showing of Actual Malice in the Absence of an Award Of Compensatory Damages

 It is clear that Appellants, as private figures, were not obligated to prove actual malice (knowledge of falsity or reckless disregard for truth or falsity) in order to recover compensatory damages. *See, e.g., Rutt v. Bethlehems' Globe Pub. Co.,* 335 Pa.Super. 163, 484 A.2d 72,

83 (1984) ("[A] private figure defamation plaintiff, seeking compensation for harm inflicted as a result of the publication of defamatory matter, must [merely] prove that the defamatory matter was published with 'want of reasonable care and diligence to ascertain the truth' or, in the vernacular, negligence."). "If the private-figure plaintiff seeks punitive damages, however, he or she must demonstrate actual malice." *Weber v. Lancaster Newspapers, Inc.,* 878 A.2d 63, 75 n. 6 (Pa.Super.2005). *See also American Future Systems, Inc. v. BBB,* 872 A.2d 1202, 1211 (Pa.Super.2005) ("A private figure plaintiff who seeks punitive damages in a defamation suit against a media defendant regarding statements touching upon a matter of public concern, must 1) show the defendant acted with actual malice and 2) prove the allegedly defamatory statements were, in fact, false.").

The trial court, without making any factual finding on the question of actual malice, held that Appellants were not entitled to punitive damages because they all failed to prove general damages. TCO, 6/1/2012, at 35. This holding is erroneous for several reasons.

First, "general damages" means actual harm, which includes emotional distress, mental anguish, and personal humiliation as well as damage to reputation; therefore, the trial court's ignoring evidence of emotional distress, mental anguish, and personal humiliation was a misapplication of the law. Further, the trial court erred as a matter of law in requiring sole, rather than substantial-factor, causation, and in concluding that the drugs-guns-prostitute articles were not of or concerning Joseph, Sr.

Second, if a libel plaintiff offers evidence to sustain all elements of his or her cause of action, punitive damages may be warranted even though the finder of fact

elects not to award compensatory damages. *Laniecki v. Polish Army Veterans Ass'n of Lucyan Chwalkowski*, 331 Pa.Super. 413, 480 A.2d 1101, 1106–1107 (1984). *See also Rhoads v. Heberling*, 306 Pa.Super. 35, 451 A.2d 1378, 1383 (1982) ("[T]he trial court did not err when it instructed the jury that it could award punitive damages to the plaintiffs, ... even if no compensatory damages were awarded since the court also told the jury that it first must find in favor of the plaintiff and against the defendant on the question of liability.") (footnote, internal quotation, and emphasis omitted); *Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 555 A.2d 800, 802 (1989) (discussing with approval *Laniecki* and *Rhoads*). Accordingly, the question of actual malice, as it relates to Appellants' claims for punitive damages, must be determined by the fact finder upon the retrial of this case.

### 2. A Showing of Actual Malice Entitles a Defamation Plaintiff to Presumed Damages

■ Appellants claim that proof of actual malice entitles them to presumed damages, alleviating the need to establish actual harm. Appellants' Brief at 67–68. We agree.

Appellants' argument is based upon federal court cases and this Court's decision in *Frisk v. News Co.*, 361 Pa.Super. 536, 523 A.2d 347 (1986). In *Frisk*, this Court upheld compensatory damages awarded after the following jury instruction.

If you find that the defendant acted either intentionally or recklessly in publishing the false and defamatory communication you may presume that the plaintiff suffered both injury to his reputation and the emotional distress, mental anguish and humiliation such as would result from such a communication. This means you need not have proof that the plaintiff suffered emotional distress, mental anguish and humiliation in order to award him damages for such harm because such harm is presumed by the law when a defendant publishes a false and defamatory communication with the knowledge that [it] is false or in reckless disregard of whether it is true or false.

*Id.* at 354 (quoting Pa.S.S.J.I. (Civ) 13.10(B)).

The continued validity of *Frisk* and the jury instruction on presumed damages has been brought into question by this Court's subsequent opinion in *Walker v. Grand Cent. Sanitation, Inc.*, 430 Pa.Super. 236, 634 A.2d 237 (1993). In *Walker*, this Court examined at length the issue of whether presumed damages are available under Pennsylvania law to a victim of defamation *per se*. The Court began by noting that the statutory requirement that a defamation plaintiff prove "special harm" seemingly abrogated the "common law rule of truly presumed damages." *Walker*, 634 A.2d at 242 (citing 42 Pa.C.S. § 8343(a)(6)). However, the *Walker* Court noted, our Supreme Court had long held that a defamation *per se* plaintiff need not prove "special damages" to satisfy the statutory burden of "special harm." [8]

This led to the next question: whether to recover a victim of defamation *per se* need prove even general damages, *i.e.* ac-

---

**8.** As we discussed in Part II, *supra*, the terms "special harm" and "special damages" are not synonymous in the context of a case of libel or slander *per se*. "Special damages" are those other than what one would typically expect to result from the tort at issue, and usually involve economic harm or pecuniary loss. *See* Restatement (Second) of Torts § 904; *Pilchesky*, 12 A.3d at 440. The meaning of "special harm" in the context of defamation *per se* is the subject of the *Walker* Court's analysis; as detailed *infra*, the Court concludes that "special harm" as used in the defamation statute means "actual harm."

tual harm (to wit, damage to reputation, emotional distress, mental anguish, and personal humiliation), as opposed to recovering based upon a presumption that he or she was damaged. "The answer to such a fundamental question has proved to be quite elusive under Pennsylvania law." *Walker*, 634 A.2d at 242. In examining the question, the *Walker* Court noted that, with the decisions in *Gertz v. Welch*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and *Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (plurality), the United States Supreme Court held that the First Amendment prohibits awarding presumed damages against a media defendant in a case involving a matter of public concern unless the plaintiff proves actual malice. *Walker*, 634 A.2d at 242–243. While these cases allow for presumed damages upon a showing of actual malice, "there is nothing in these cases that would indicate that a state is ever required to award presumed damages." *Id.* at 243. Therefore, whether presumed damages are ever available remained an unanswered question of Pennsylvania law after *Gertz* and *Dun & Bradstreet*.

The *Walker* Court proceeded to examine what Pennsylvania appellate courts had discussed on the issue, noting that in *Agriss, supra*, this Court "acknowledged the soundness of *Gertz's* rationale" in holding that all libels were actionable without proof of special damages, but nonetheless required proof of actual harm (*i.e.*, general damages). Accordingly, "*Agriss'* reference to *Gertz* ... indicate[d] that this Court entertains a policy against allowing damages without any proof of actual harm." *Walker*, 634 A.2d at 243.

That still begged the question: "is it the law?" *Id.* This Court, upon examining the

case law, found "little express guidance." *Id.* at 243. However, based upon the way our Supreme Court reviewed a defamation *per se* case in *Solosko v. Paxton*, 383 Pa. 419, 119 A.2d 230 (1956), the *Walker* Court concluded that "[t]he Supreme Court's very act of reviewing the record for ground[s] upon which the jury may award damages implies what has never been said-the burden is on the plaintiff to establish at least general damages." *Walker*, 634 A.2d at 243–244. Further, this Court reasoned, "if a plaintiff in a slander *per se* case were not required to prove any damages whatsoever, why does a rule of Pennsylvania law provide that she need not prove 'special' damages? Why not hold that an alleged victim of a slander *per se* has no duty to plead 'damage' and leave it at that?" *Id.* at 244.

Based upon *Agriss, Solosko*, and the fact that there would be no need to limit the *per se* defamation plaintiff's damages exemption to "special" damages if no damages at all need be proven, the *Walker* Court concluded "that Section 621 of the Restatement (Second) of Torts accurately states the law of Pennsylvania with regard to damages in cases of slander *per se*.[9] Namely, a defendant who publishes a statement which can be considered slander *per se* is liable for the proven, actual harm the publication causes." *Id.*

Thus, *Walker* seems to suggest that compensatory damages are unavailable to a plaintiff in a defamation *per se* action unless actual harm, *i.e.* general damages, are proven. However, as the Third Circuit aptly noted, "[a]lthough *Walker* appears generally to foreclose presumed damages under Pennsylvania law, it is not entirely clear whether presumed damages remain available **where the plaintiff proves actu-**

9. As stated in note 3, *supra*, libel cases are subject to the same requirements as slander

*per se* cases as far as proof of damages is concerned.

al malice." *Franklin Prescriptions, Inc. v. New York Times Co.*, 424 F.3d 336, 342 (3d Cir.2005) (emphasis added). For the following reasons, we conclude that presumed damages do indeed remain available upon a showing of actual malice.

First, as noted above, the Pennsylvania Suggested Standard Jury Instructions allowing presumed damages upon a showing of actual malice, and the *Frisk* decision approving those instructions, were issued prior to *Walker*, yet *Walker* mentions neither. The most reasonable explanation for this is that *Walker* did not involve a claim of actual malice; thus, the holding of *Walker* does not pertain to a case in which actual malice is alleged and proven.[10]

Second, the Restatement section adopted in *Walker* is published with the following caveat: "[t]he Institute takes no position on whether the traditional common law rule allowing recovery in the absence of proof of actual harm, for the harm that normally results from such a defama-

tion, may constitutionally be applied if the defendant knew of the falsity of the communication or acted in reckless disregard of its truth or falsity." Restatement (Second) of Torts § 621, Caveat. Hence, the *Walker* Court's adoption of Section 621 did not mandate a change in the existing law (*Frisk*) which permitted presumed damages upon a showing of actual malice.

Third, as noted in *Walker*, *Gertz* left open the possibility of presumed damages upon a showing of actual malice. *See Gertz*, 418 U.S. at 349, 94 S.Ct. 2997. ("[W]e hold that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth."). That is the minimum standard the First Amendment of the United States constitution requires in balancing the interests of free speech against the states' interest in compensating victims of defamation.[11] As our Supreme Court reaffirmed not long ago,

---

**10.** This appears to be the understanding of the drafters of the present suggested jury instructions, which still provide that presumed damages are available upon a showing of actual malice. Pa. Suggested Standard Jury Instructions (Civil) § 17.180 (4th ed. 2011). The Subcommittee Note indicates that this is based upon *Gertz* and was upheld in *Frisk*. Although *Walker* is also referenced in the Subcommittee Note, its suggestion that actual harm be proven rather than presumed is not addressed.

**11.** A number of state courts have held that presumed damages are available when actual malice is proven. *See, e.g., Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc.*, 219 S.W.3d 563, 593 (Tex. App.–Austin 2007) ("[T]he jury's finding of actual malice is supported by clear and convincing evidence and [therefore] the trial court erred in refusing to question and instruct the jury on the issues of defamation *per se* and presumed damages."); *Jobes v. Evangelista*, 369 N.J.Super. 384, 849 A.2d 186, 194 (A.D.2004) ("[I]n effecting the balance between private reputational interest and free speech relating to matters of public concern,

the presumed-damages rule will continue to obtain if the defamatory utterance was attended by actual malice...."); *WJLA–TV v. Levin*, 264 Va. 140, 564 S.E.2d 383, 392 (2002) ("The jury having found by special interrogatory that WJLA acted with actual malice, Dr. Levin was entitled to receive presumed as well as actual damages."); *Samuels v. Tschechtelin*, 135 Md.App. 483, 763 A.2d 209, 245 (2000) ("[I]f the statement is defamatory *per se*, damages are presumed when a plaintiff can demonstrate actual malice, by clear and convincing evidence, even in the absence of proof of harm."); *Khawar v. Globe Intern., Inc.*, 19 Cal.4th 254, 79 Cal.Rptr.2d 178, 965 P.2d 696 (1998) (affirming award of presumed damages where actual malice proven). *But see Mitchell v. Griffin Television, L.L.C.*, 60 P.3d 1058, 1066 (Okla.Civ.App. Div. 3 2002) (holding trial court erred in instructing jury that damages may be presumed upon proof of malice because statute requiring proof of "such actual ... damages as he has alleged and proved" means "[d]amages must be proved, not presumed.").

"reputational interests occupy an elevated position within our state Constitution's system of safeguards, and hence, in the context of defamation law the state Constitution's free speech guarantees are no more extensive than those of the First Amendment." *American Future Systems, Inc. v. Better Business Bureau of Eastern Pennsylvania*, 592 Pa. 66, 923 A.2d 389, 395 (2007) (footnote omitted). It follows that, because Pennsylvania provides the utmost protection of reputational interests, and awarding presumed damages upon a showing of actual malice is permissible under the First Amendment, such damages remain available under Pennsylvania law.

Accordingly, we hold that, under Pennsylvania law, proof of actual malice [12] entitles a defamation plaintiff to presumed damages, as provided in Pa. Suggested Standard Jury Instructions (Civil) § 17.180(B) (4th ed. 2011).[13]

### D. The Trial Court Erred in Entering a Verdict in Favor of Appellees on the False Light Claims Based Upon its Erroneous Conclusion that Appellants Suffered No Actual Harm

In addition to defamation claims, Appellants proceeded upon a theory of false light-invasion of privacy, which the Restatement defines as follows.

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and

> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E. The Comment offers the following explanation of the relationship of invasion of privacy-false light and defamation.

> The interest protected by this Section is the interest of the individual in not being made to appear before the public in an objectionable false light or false position, or in other words, otherwise than as he is. In many cases to which the rule stated here applies, the publicity given to the plaintiff is defamatory, so that he would have an action for libel or slander under the rules stated in Chapter 24. In such a case the action for invasion of privacy will afford an alternative or additional remedy, and the plaintiff can proceed upon either theory, or both, although he can have but one recovery for a single instance of publicity.

---

12. Appellants acknowledge that the trial court's error was one of law in failing to address the issue of actual malice. Appellants' Brief at 67–68 n. 33. We conclude that the error entitles Appellants to a new trial as to actual malice, as we cannot on the record before us conclude that Appellants are entitled to JNOV based upon this evidence, because it is not so overwhelmingly clear that no reasonable minds could differ on the issue.

13. If you find that the defendant acted either intentionally or recklessly in publishing the false and defamatory communication, you

may presume that the plaintiff suffered both injury to [his][her] reputation and the emotional distress, mental anguish, and humiliation that would result from such a communication. This means you need not have proof that the plaintiff suffered emotional distress, mental anguish, and humiliation in order to award [him][her] damages for such harm because such harm is presumed by the law when a defendant publishes a false and defamatory communication with the knowledge that it is false or in reckless disregard of whether it is true or false.

It is not, however, necessary to the action for invasion of privacy that the plaintiff be defamed. It is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position. When this is the case and the matter attributed to the plaintiff is not defamatory, the rule here stated affords a different remedy, not available in an action for defamation.

*Id.* at Comment b.

The trial court entered a verdict in favor of Appellees on these claims, pointing to its earlier finding that Appellants failed to establish that they suffered any damages as a result of the publication of the *Citizens' Voice* articles. TCO, 6/1/2012, at 36–37.

Our holding *supra* that the trial court's finding as to damages on the defamation claims was erroneous invalidates the trial court's determination of the same issue as to the invasion of privacy claims. Accordingly, we conclude that the trial court abused its discretion in denying a new trial on the invasion of privacy damages.[14]

### E. The Trial Court's Rejection of Acumark's Special Damages Claim Was Neither an Abuse of Discretion Nor Against the Weight of the Evidence

 In their final question on appeal, Appellants argue that the trial court's determination that Acumark failed to prove

special damages is against the weight of the evidence. Appellants' Brief at 68–69. For the following reasons, we disagree.

A new trial based on weight of the evidence issues will not be granted unless the verdict is so contrary to the evidence as to shock one's sense of justice; a mere conflict in testimony will not suffice as grounds for a new trial. Upon review, the test is not whether this Court would have reached the same result on the evidence presented, but, rather, after due consideration of the evidence found credible by the [factfinder], and viewing the evidence in the light most favorable to the verdict winner, whether the court could reasonably have reached its conclusion. Our standard of review in denying a motion for a new trial is to decide whether the trial court committed an error of law which controlled the outcome of the case or committed an abuse of discretion.

We stress that if there is any support in the record for the trial court's decision to deny the appellant's motion for a new trial based on weight of the evidence, then we must affirm.

*Winschel v. Jain,* 925 A.2d 782, 788 (Pa.Super.2007) (internal quotations and citations omitted).

The trial court offered the following analysis of Acumark's [15] special damages claim.

Acumark failed to prove the amount of its alleged lost revenue with a reason-

14. For the same reasons discussed in Part III(A) *supra* regarding Appellants' defamation claims, there was no reason for the trial court to reach the issue of damages on the false light claims unless the trial court had determined that Appellants had proven Appellees' liability for those claims. Accordingly, only the question of damages need be addressed in the new trial on Appellants' invasion of privacy claims.

15. We note that Airport Limousine did not make a separate claim for special damages. Rather, because Airport Limousine's revenues were reported as part of Acumark's revenues, Acumark's claim encompassed the special damages allegedly suffered by Airport Limousine. *See* TCO, 6/1/2012, at 30–31.

able degree of certainty and did not prove that the alleged lost revenue was proximately caused by the alleged defamatory statements in the *Citizens' Voice* articles. Initially, Acumark's financial records show that Acumark's revenues increased from 1.4 million dollars in 2001, to 1.41 million dollars in 2002 and to 1.51 million dollars in 2003. Acumark presented the testimony of Andrew Verzilli who testified that Acumark's revenues would have been even higher if it had performed at its ideal potential. The opinion that Verzilli ultimately offered was that Acumark had the potential to earn between 2.0 million dollars and 2.9 million dollars more than it actually did between 2001 and 2009, and for some reason or reasons it did not. In order to do this, Verzilli started with a snapshot of Acumark's historical performance in 2000 and applied a 5% to 10% growth rate to this base year figure between 2001 and 2006, and a flat growth rate after 2006. He only measured the difference between Acumark's actual revenue and the revenue, assuming this potential growth, to reach a difference in revenue for each year and, then, applied a 70% reduction to account for costs, to reach a net profit for Acumark. Verzilli did not take into account any other factors that may have impacted potential growth, including the impact of 9/11; two recessions in the 2001 to 2009 time period; the fact that Offset Printing was a declining business model process which required Acumark to completely retool its printing business; the impact of the U.S. Airways bankruptcy; the fact that Do–Not–Call legislation wiped out Acumark's call center business, which constituted 30 to 35% of Acumark's business; or the disabling impact of the auto accident on Joseph, Sr.'s personal ability to generate new business. Verzilli admitted he did not

offer an opinion on causation at all. Verzilli offered no opinion as to what the cause(s) were for Acumark's alleged inability to perform to its potential from 2001 to 2009. In fact, [Appellants] did not offer any competent evidence to show any of the alleged lost profits [revenues] were proximately caused by the *Citizens' Voice* articles.... Mr. Verzilli's opinion about Acumark's potential did not provide a sufficient basis for [the trial c]ourt to determine if the claimed potential would or could ever have been realized. A window of possibility is not a reasonably certain basis for calculating damages. Moreover, instead of doing a customer analysis based upon verified and/or verifiable customer performance data, Verzilli, in formulating his opinion, uncritically relied upon a mélange of sometimes fragmentary information Joseph, Sr. provided to him as to what the data constituted; where Joseph, Sr. believed his company was heading and on 2004 forecasts predicting how a number of selected industries would perform between 2004 and 2005. After a review of the evidence and observation of the witnesses, there is an insufficient basis for uncritical reliance on Joseph, Sr.'s representations.... While [Appellants] claim that the articles linking [Appellants] to guns, drugs, and prostitutes, led to the loss of several of Joseph, Sr.'s customers, including Adelphia Cable, North Penn Savings & Loan, CEO People Helping People, the University of Scranton, St. Ann's Media, Catholic Golden Age Charities, and Luzerne County Courthouse, [Appellants] did not offer any testimony from any of these customers indicating that they withdrew or transferred their business because of the *Citizens' Voice* articles, nor was Mr. Verzilli provided with documentation indicating that these customers withdrew their business because of the *Citizens'*

*Voice* articles. The defense expert, Mark Gleason, provided testimony and documentation which analyzed the actual customer data and determined that the business from these customers actually increased significantly in the three years after the publication of the *Citizens' Voice* articles.

Joseph, Sr. and Joseph, Jr. testified that Acumark and Airport Limousine lost local customers as a result of the publicity associated with the *Citizens' Voice* articles. However, Acumark's financial documents reflect that 80% of Acumark's revenue after the *Citizens' Voice* articles remained local in nature. Moreover, Joseph, Sr.'s claim that the articles caused him to lose lucrative local business was completely at odds with his testimony, as part of his accident case, that he was forced to give up foreign and national accounts, and instead take on less profitable local business.

[Appellants] also claimed that they lost significant political customer accounts. Other than their own testimony stating that Acumark had significant political business in May 2001 and then no political business in November 2001, no documents were introduced to substantiate this claim and no specific account or customer was either credibly (1) identified or (2) testified.

TCO, 6/1/2012, at 32–35 (citations, quotation marks, and emphasis omitted).

We discern no error of law or abuse of discretion in this analysis. Unlike with the general damages claims, there is no indication in the trial court's analysis of Acumark's proof of special damages that the trial court imposed an erroneous burden on Acumark or ignored relevant evidence. It simply was unconvinced by the Josephs' testimony as to causation and by Verzilli's opinion evidence that Acumark failed to achieve a factually-unsupported potential.

Rather, the trial court was persuaded by Appellees' expert, and other specified factors that explained Acumark's performance between 2001 and 2009. Accordingly, we hold that the trial court did not abuse its discretion in denying Acumark's post-trial motions based upon the weight of the evidence concerning its claim for special damages.

## IV. Conclusion

In sum, we hold that the trial court abused its discretion in denying Appellants' motion for a new trial because (1) it failed to consider Appellants' evidence of emotional distress, mental anguish, and personal humiliation; (2) it applied the incorrect standard of proof in requiring all Appellants to prove that the defamation was the sole cause, rather than merely a substantial cause, of their damages; (3) it held that the August 6, 2001 article was not of or concerning Joseph, Sr.; (4) it failed to make a factual finding on whether Appellees published the articles with actual malice; and (5) it dismissed Appellant's false light claims for want of proof of damages. However, we affirm the order denying the motion for a new trial as to the special damages claims of Acumark. We therefore vacate the judgment, and remand the case for a new trial on the issues of (1) whether Appellees acted with actual malice, (2) what, if any, general damages Appellants suffered as a result of the defamatory articles, and (3) whether Appellants are entitled to punitive damages.

Judgment vacated. Order denying posttrial motions affirmed in part and reversed in part. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.