J-A15016-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | |
|---|---|
| RICHARD A. SPRAGUE, ESQUIRE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| JILL PORTER, PHILADELPHIA NEWSPAPERS, LLC, PHILLY ONLINE, LLC, PMH ACQUISITION, LLC, PHILADELPHIA MEDIA HOLDINGS, LLC | |
| Appellees | No. 1649 EDA 2013 |

Appeal from the Order May 17, 2013
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 2930 January Term, 2010

BEFORE:  PANELLA, J., LAZARUS, J., and PLATT, J.[*]

DISSENTING MEMORANDUM BY PANELLA, J.:      **FILED AUGUST 26, 2014**

The decision of the trial court in this case undermines the principles of a criminal defense attorney's responsibilities in our American legal system. As I will further discuss, the accusations made by the Appellees, aimed at a lawyer appropriately advocating in his capacity as a criminal defense attorney, would serve to repress the defense that every citizen of the United States is entitled. This case involves issues over which every practicing

_____

[*] Retired Senior Judge assigned to the Superior Court.

attorney in Pennsylvania should be concerned. As this Court stated in *Commonwealth v. Connolly*, 689 A.2d 950 (Pa. Super. 1997):

> Effective representation of a criminal defendant entails more than presenting a vigorous and cogent defense. There also exists the duty to portray one's client in as favorable a light as possible so that the jury may view him as a fellow citizen clothed in the protective shroud of innocence rather than a state correctional institution jumpsuit.

*Id*., at 953. I vigorously dissent from the decision of the Majority, which affirms on the basis of the trial court's opinion—a decision that misapplies existing law.

The appropriate standard of review in addressing a motion for summary judgment is that the court must review the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *See*, *e.g.*, *ToDay's Housing v. Times Shamrock Communications, Inc.*, 21 A.3d 1209, 1213 (Pa. Super. 2011). After reviewing the trial court's decision, certified record, and appellate briefs, I conclude that the trial court failed to properly review the evidence of record in a light most favorable to the non-moving party, Attorney Richard Sprague. I must therefore dissent.

The background and contextual facts necessary to evaluate the claims at stake in this case are largely uncontroverted. State Senator Vincent J. Fumo and an associated non-profit organization, Citizens Alliance ("Citizens") were under investigation by the FBI. Pursuant to the

investigation, the FBI subpoenaed records and e-mails in the possession of Citizens in the spring of 2004. Thereafter, on the evening of February 18, 2005, the FBI executed search warrants on Fumo's offices in Philadelphia and Harrisburg.

As the investigation continued, the FBI discovered that after Citizens had been served with a subpoena, but before the search of Fumo's offices, Fumo had deleted e-mails and their backups. In January 2006, the U.S. Attorney's Office advised Fumo that they intended to bring obstruction of justice charges based upon the deletion of the e-mails and their backups.

Fumo retained Attorney Sprague to discuss the pending obstruction of justice charges and possible defenses. At this meeting, Fumo blamed his information technology personnel for being overly zealous, and opined that he was not required to preserve the e-mails until his records, as opposed to Citizens's, had been subpoenaed. Attorney Sprague and his associates informed Fumo that his opinion was incorrect, and that if he knew he was under investigation, he had a duty under federal law to preserve evidence.

A few days later, Attorney Sprague met with Fumo once again to discuss the pending charges. At this meeting, Fumo inquired whether it would help his defense if a lawyer had advised him that he had no duty to preserve the e-mails unless he had been personally subpoenaed. After receiving an affirmative answer, Fumo left the office and returned a short while later, stating that he had a lawyer who would state that he had given

Fumo such advice at the relevant time. When Attorney Sprague asked for the name of the attorney, Fumo replied that it was Robert Scandone, Esquire.

Attorney Sprague requested Attorney Scandone to endorse an affidavit to the fact that he had provided such advice to Fumo. Attorney Scandone ultimately supplied a letter to Attorney Sprague, dated February 10, 2006, that outlined discussions Attorney Scandone had with Fumo. In relevant part, the letter stated:

> I told him that Citizens was a separate entity and that his attorneys were required to respond with responsive records. If, in connection with Citizens' response, he and his staff were asked to cooperate, that they should do so, though they were under no specific obligation to do so. I further explained that if the grand jury sought records from his office, that he and/or his staff members would be subpoenaed directly. Finally, I advised him that because this subpoena was not directed to him or his office, there was no reason for him or his staff to do anything other than what was done in the normal course of District Office business.

Letter from Robert Scandone, Esq., 2/10/06. Attorney Sprague subsequently turned the letter over to the federal government.

On February 6, 2007, then United States Attorney Patrick Meehan (who is now a member of Congress) held a press conference outlining his decision to charge Fumo and three of his aides on charges of fraud, tax offenses and obstruction of justice. At the conference, Meehan distributed a press release describing the allegations supporting the charges.

In response, on February 8, 2007, Attorney Sprague held a press conference, the substance of which forms the primary point of contention between the parties in the present appeal. Attorney Sprague opened the conference by thanking those in attendance for coming to "listen to Senator Fumo's side of this matter." After spending a substantial amount of time describing Fumo's accomplishments in office, Attorney Sprague made the following statement:

> Mr. Meehan knows that when Citizens' was, in the papers, under investigation, Senator Fumo went and sought advice from a lawyer, not me, but a lawyer, whether he had to change his [e-mail retention] policy.

> And this has been told to the government.

Transcript of the Press Conference of Richard A. Sprague, 2/8/07, transcribed from a recording on 4/22/11, at 26.

Attorney Sprague and Fumo also concluded that they desired a meeting with the United States House of Representatives Judiciary Subcommittee on Commercial and Administrative Law and the United States Senate Majority Whip to discuss their belief that the Justice Department was selectively prosecuting Democrats. The Subcommittee requested a memorandum supporting this belief.

Subsequent to this meeting, Attorney Sprague sought to withdraw from representing Fumo. However, prior to withdrawing, Attorney Sprague committed to drafting the memorandum for the Subcommittee as a final obligation of his representation. One of Attorney Sprague's associates

drafted the memorandum, and submitted it to the Subcommittee on November 21, 2007.

This memorandum set forth Fumo's contention that Meehan was misusing his office for partisan political purposes. The document began with a summary of Fumo's allegations and then specifically stated that "*Senator Fumo*" was relying on the evidence of improper motive. (Emphasis supplied). Shortly thereafter, the memorandum stated that "the Senator seeks to provide the Subcommittee with the background and context which he believes shows how the pervasive politicization of the Department of Justice … directly impacted the unfair and unprecedented manner in which the investigation of him was conducted and ultimately … to indict him on legally questionable charges." Of importance to Appellees' arguments on appeal, in footnote 12, the memorandum states

> The last broad category of charges relates to allegations of conspiracy to obstruct justice. In this regard, Senator Fumo is alleged to have conspired to obstruct the investigation. In pursuing these charges, the government intentionally ignored documentary evidence of a long standing document retention policy and was followed until a search warrant was served in the Senator's office. The government also ignored uncontroverted evidence of the Senator's reliance upon (albeit erroneous) legal advice for much of the relevant period.

Memorandum to Eric Tamarkin, Esq., from Sprague & Sprague, 11/21/2007, at 10 n.12. In the final paragraph, titled "Conclusion," the memorandum closed with the following sentence: "The Senator asks this Subcommittee to affirm this most basic truth," referring to an assertion that public confidence

in law enforcement requires the elimination of partisan politics from its decision making. *Id.*, at 11.

At Fumo's criminal trial, Fumo testified that Attorney Sprague had advised him that the e-mails could be deleted so long as he or his office had not been served with a subpoena. As a result of this testimony, the court ruled that Fumo had waived the attorney-client privilege, and the federal government subpoenaed Attorney Sprague to testify. On the stand, Attorney Sprague testified that he had never given such advice to Fumo. *See* N.T., Trial, 2/18/09, at 90. On cross-examination, Attorney Sprague stated that he had "doubted the truth of it [Fumo's assertion that he had been advised by Attorney Scandone] very much from the beginning." *Id*., at 157. When Fumo's counsel then sought to impeach Attorney Sprague, Sprague testified that his duty was to "convey what my client was saying" and that "whether I believed him or not was not the issue." *Id*., at 163. Fumo's counsel also questioned Attorney Sprague about the memorandum to the Subcommittee, and the assertion that the evidence concerning Attorney Scandone was uncontroverted. Attorney Sprague answered "It was uncontroverted. There was no one else to dispute it. Did I believe it? Of course not." *Id*., at 164.

On Friday, February 20, 2009, reporter Jill Porter published a column in the Philadelphia Daily News about Attorney Sprague's testimony at the Fumo trial. The column was titled: "The law, duty & truth." In the column,

Porter wrote that Sprague had "acknowledged that he was something of a liar, too." This comment caused a a fellow reporter to opine that Porter had "led [off] with a hard right to [Attorney Sprague's] jaw."

Porter included references to the opinion of Robert Tuttle, professor of professional responsibility at George Washington University School of Law. Professor Tuttle had opined that, while it may not be illegal, it is immoral for an attorney to lie to the public. However, Professor Tuttle later wrote a letter to the newspaper complaining that Porter had misleadingly used his comments out of context to suggest that he was offering an opinion on Attorney Sprague's conduct. Professor Tuttle stated that he "did not offer, nor did [he] intend to offer, any opinion about the conduct of Mr. Sprague, ethical, moral, or otherwise." He felt that someone reading Porter's article would be misled into believing that he had offered such an opinion, and that the reader would not know that he was only opining about an instance involving materially inconsistent statements.

At her deposition, Porter testified that Attorney Sprague's statements were "true as far as the literal interpretation of it." N.T., Deposition of Jill Porter, 2/8/12, at 55. She further admitted that she had not attempted to support her published assertion that Attorney Sprague's statements were lies. "I don't know what is or isn't false. *I don't know what evidence the government did or didn't have, so I can't really say.*" **Id**., at 61 (emphasis supplied).

Attorney Sprague subsequently filed a complaint against Appellees, asserting causes of action for defamation and invasion of privacy - false light. Discovery ensued, and ultimately, the trial court granted Appellees' motion for summary judgment on all claims.

Under the First Amendment to the United States Constitution, a plaintiff asserting defamation concerning a publication of a matter of "public concern" bears the burden of proving that the publication was false. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986). If it cannot be conclusively determined that the publication was false, or even if the factfinding process is unable to resolve conclusively whether the speech was true or false, the plaintiff's claim must fail. *See id*.

On this issue, the trial court's opinion exhibits a problematic summary of existing precedent. The trial court states that "Mr. Sprague has the burden of proving by clear and convincing evidence that the offending statement was false...." Trial Court Opinion, 11/1/13, at 23. The trial court then provides a string of citations that ostensibly stand for the proposition that the standard is "clear and convincing evidence." However, in my review of those cases, only one of the cited cases arguably supports the trial court's statement.

The first citation in the string, *Hepps v. Philadelphia Newspapers, Inc.*, 485 A.2d 374, 389 (Pa. 1984), is a case in which a private, non-public figure sued a newspaper for defamation. On appeal, the newspaper

conceded that state law could assign the burden of establishing truth upon a defendant in a case concerning a non-public figure. Thus, the Court in **Hepps** was concerned with the issue of whether the application of Pennsylvania's traditional presumption of falsity in such a case remained the rule in light of the United State Supreme Court's developing First Amendment doctrine. The Court held that presumption of falsity still applied and reversed the case, as the trial court had held that the presumption was no longer valid under the First Amendment.

The portion of the decision cited by the trial court in its opinion on appeal in this case deals with the issue of punitive damages. The **Hepps** Court held that the traditional presumption of falsity does not contribute to the plaintiff's burden of establishing the "fault" element of actual malice. Specifically, the Court held that the court could not presume actual malice pursuant to the traditional presumption of falsity:

> In this instance it would require presuming not only that the content was false, but also that the defendant at the time of publication knew of that falsity. This is the clearest type of double presumption that we have rejected.

**Id**., at 389. Accordingly, the **Hepps** Court treated falsity as a separate element from the state of mind of the defendant. However, the opinion does not explicitly state a standard of proof for falsity, only for the element of reckless disregard of the truth. **See id**.

In any event, the Supreme Court of Pennsylvania's opinion in **Hepps** is a problematic citation, as it was reversed by the Supreme Court of the

United States in ***Philadelphia Newspapers, Inc. v. Hepps***, 475 U.S. 767 (1986) ("Hepps II"). The ***Hepps II*** Court held that Pennsylvania's common law presumption of falsity must "fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages." *Id*., at 776. Once again, it is clear that the element of falsity is separate from the fault element. If any question remained, the Supreme Court of the United States explicitly answered it in footnote 4, which was surprisingly included the trial court's string citation here:

> We also have no occasion to consider the quantity of proof of falsity that a private-figure plaintiff must present to recover damages. Nor need we consider what standards would apply if the plaintiff sues a nonmedia defendant.

*Id*., at 779 n.4. Thus, the ultimate, authoritative opinion in the ***Hepps*** litigation explicitly disclaimed that it was setting forth a clear and convincing standard for the burden of proof for falsity.

***Ertel v. Patriot-News Co.***, 674 A.2d 1038 (Pa. 1996), is another case utilized by the trial court as authority for its assertion that Attorney Sprague bore the burden of proving falsity by clear and convincing evidence. The relevant passage in ***Ertel*** provides:

> Thus, it is the burden of a public figure plaintiff, such as Ertel, to show that the statements at issue are false. …
>
> In addition to establishing that the statement was false, the public figure plaintiff must also establish that the defendant published the statement with "actual malice," or in other words, published the statement "with knowledge that it was false or with reckless disregard of whether it was false or not."

- 11 -

*Id*., at 1041. Once again, the opinion does not explicitly assign the clear and convincing standard to the plaintiff's burden of proving falsity. In fact, the *Ertel* opinion stated that as "Ertel did not produce any evidence of falsity, there was no genuine issue of material fact regarding falsity." *Id*., at 1042. Thus, there was no need to apply any standard of proof to Ertel's evidence of falsity, as there was none. And, once again, the element of falsity is treated as separate from the element of actual malice.

Another case cited by the trial court in support of its assertion regarding the appropriate standard for the burden of proof on the issue of falsity is *Milkovich v. Lorain Journal Co*., 497 U.S. 1 (1990). The trial court cites to footnote six of the *Milkovich* opinion, which I quote in full, omitting only citations:

> In *Hepps*, the Court reserved judgment on cases involving nonmedia defendants and accordingly we do the same. Prior to *Hepps*, of course, where public-official or public-figure plaintiffs were involved, the *New York Times* rule already required a showing of falsity before liability could result.

*Id*., at 20 n.6. Footnote 6 clearly does not explicitly assign a clear and convincing standard to the burden of falsity. And again, it is clear that the issue of falsity is treated as separate from the issue of fault or actual malice.

The one case cited by the trial court that actually supports its assertion that a *clear and convincing standard* applies to the burden of proving falsity is *Tucker v. Philadelphia Daily News*, 848 A.2d 113, 127-128 (Pa. 2004). After the heading entitled "Actual Malice", the Supreme Court of

Pennsylvania, begins its review of existing federal case law on the First Amendment limits on state defamation claims with the following statement:

> To prevail on their defamation claim, the Tuckers, as public figures, must prove, by clear and convincing evidence that the allegedly defamatory statements were false and that Appellant-newspapers either knew they were false or recklessly disregarded their falsity.

*Id*. Thus, for the first time, a case cited by the trial court for the proposition that the appropriate standard is clear and convincing actually contains language supporting that conclusion.

However, there are several readily apparent reasons to doubt that the Supreme Court of Pennsylvania intended to impose a higher evidentiary standard than the minimum set forth by the United States Supreme Court for compliance with the First Amendment. First, the fact that the quoted sentence appears directly under the heading "Actual Malice" leads me to believe that the Supreme Court was focused on the issue of actual malice, and not falsity. As noted above, case law has consistently treated these two elements as distinct, and therefore discussion of the standard of proof applicable to falsity was likely not the principle intent of the paragraph.

Second, the Supreme Court cited to *Milkovich* to support the proposition. *See id*. As noted previously, *Milkovich* does not support this conclusion, and, in fact, explicitly rejects the notion that it addressed the issue of the standard for the burden of proving falsity. Furthermore, the *Tucker* opinion pinpoint cites to 497 U.S. at 15 as its authority for the

sentence at issue. The only mention of the clear and convincing standard on page 15 of the U.S. Reporter is an acknowledgment that the clear and convincing standard applies to the burden of actual malice borne by public officials and public figures.

Finally, the Supreme Court of Pennsylvania did not engage in an extended analysis of the application of the *clear and convincing standard* to the burden of proving falsity. It is unlikely that such a drastic shift in the law would be imposed in such a flippant fashion. As a result, I conclude that the single sentence in **Tucker** highlighted by the trial court does not represent a definitive statement of Pennsylvania law. Interestingly, this Court has recently addressed the issue explicitly, and reached the opposite conclusion. **See Joseph v. Scranton Times L.P.**, 959 A.2d 322, 335 (Pa. Super. 2008) ("Appellees bore the burden of proving, by a preponderance of the evidence, that the Defamatory Articles were, in fact, false.") At the very least, then, the question of the standard of proof applicable to Sprague in the instant matter is an issue deserving of a more thorough analysis than a single, conclusory sentence.

As such, I would reject joining the Majority in affirming on the opinion of the trial court, even if I agreed with their ultimate decision to affirm.

I conclude, however, that the evidence of record, when viewed under the appropriate standard of granting all reasonable inferences to the non-moving party, is more than sufficient to establish, clearly and convincingly,

that the "The law, duty & truth" article penned by Jill Porter was false in significant aspects. Therefore, despite the incorrect standard applied by the trial court and the majority, reversal of the trial court is appropriate under either standard the clear and convincing standard or the preponderance of the evidence standard.

As a prefatory matter to this discussion, it is important to understand the role of attorneys in the United States justice system. Professional persons who choose to become attorneys subject themselves to certain duties in excess of the common citizen regarding the quality of justice. *See* Pa.R.P.C., Preamble and Scope, at [1]. "One of the cardinal principles confronting every attorney in the representation of a client is the requirement of complete loyalty and service in good faith to the best of his ability." *Johns v. Smyth*, 176 F.Supp. 949, 952 (E.D. Va. 1959). This duty entails a requirement for criminal defense counsel to "present conflicting evidence to the court, not judge the issue for himself." *Osborn v. Shllinger*, 861 F.2d 612, 628 (10th Cir. 1988). "Except in the rarest of cases, attorneys who 'adopt the role of the judge or jury to determine the facts,' pose a danger of depriving their clients of the zealous and loyal advocacy required by the Sixth Amendment." *Nix v. Whiteside*, 475 U.S. 157, 189 (Blackmun, J., concurring in judgment) (internal citation omitted). The Third Circuit Court of Appeals has explicitly rejected the contention that

a criminal defense attorney must act on his personal beliefs regarding his client's testimony:

> While defense counsel in a criminal case assumes a dual role as a "zealous advocate" and as an "officer of the court," neither role would countenance disclosure to the Court of counsel's private conjectures about the guilt or innocence of his client. It is the role of the judge or jury to determine the facts, not that of the attorney.
>
> …
>
> It is apparent that an attorney may not volunteer a mere unsubstantiated opinion that his client's protestations of innocence are perjured. To do so would undermine a cornerstone of our system of criminal justice.

**U.S. ex rel. Wilcox v. Johnson**, 555 F.2d 115, 122 (3d Cir. (Pa.), 1977).

The distinction between "belief" and "knowledge" plays an important role in the Pennsylvania Rules of Professional Conduct. Rule 3.3 prohibits a lawyer from knowingly making a false statement of material fact or presenting evidence of such. However, the Rule then explicitly distinguishes situations where a lawyer merely believes that evidence is false: "A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false." Pa.R.P.C., Rule 3.3(a)(3). As far back as 1884, at the least, it was recognized that a lawyer is not to act on merely his opinion, as opposed to certain knowledge, of his client's testimony: "The lawyer who refuses his professional assistance because in his judgment the case is unjust and indefensible,

usurps the functions of both judge and jury." Sharswood, *Legal Ethics*, (5th Ed. 1884), at 84.

As Fumo's defense lawyer, Attorney Sprague had no choice but to respond to the press conference held by the United States Attorney in order to preserve a fair jury pool. Former Philadelphia District Attorney and Common Pleas Judge Lynne Abraham testified that a criminal defense attorney holds a press conference to counter the power of the prosecutor to influence public perception through press conferences. **See** N.T., Deposition of Lynne Abraham, Esq., 1/16/13, at 127.

> And he's saying, not his personal opinion, but what he wants the public to know about this case and why he or she thought the prosecutor brought it against him.
>
> …
>
> What the defense attorney is going to say, my client is innocent, he didn't do it, he was home in bed, he was in Ohio, misidentification, witnesses lied, it's not his – it's not what he believes, it's what he's going to do to push back against he power of the prosecutor to have all those cameras in front, make all those statements, and this defendant doesn't have any voice for him.
>
> His lawyer is his voice, whoever the defendant is: powerful and wealthy, poor and indigent. A lawyer's duty is not to say what he personally believes or what his client told him. It's to push back against the power of the prosecution.

*Id*.

In the present matter, the alleged defamatory statements were printed in an article entitled "The law, duty & truth." The article referenced and used select quotes from a press conference Attorney Sprague held to

counter the press conference held by Meehan to announce the charges against Sprague's client, Senator Vincent Fumo. Attorney Sprague opened his press conference with the following statement: "I want to thank everybody here for taking the time to come and listen to Senator Fumo's side of this matter." Transcript of press conference, 2/8/07, at 2. Of particular relevance to the present litigation, Attorney Sprague stated that "Mr. Meehan knows that … Senator Fumo went and sought advice from a lawyer, not me, but a lawyer, whether he had to change his policy. And this has been told to the government." *Id*., at 26. As noted previously, Attorney Sprague has since testified that he didn't believe this statement was true.

In her article, Porter wrote that Attorney Sprague "acknowledged that he was something of a liar[.]" Porter then juxtaposed quotes from Attorney Sprague's testimony at Fumo's trial, admitting that he did not believe the assertion that Fumo had been acting on the advice of counsel with several additional assertions:

> So one of the most powerful attorneys in Philadelphia believes that it is acceptable to deliberately mislead the public on behalf of a client?
>
> That it's appropriate to vigorously perpetrate an untruth, as part of his legal obligation?
>
> That's sure to enhance the credibility of lawyers – such as it is.
>
> Sprague's posturing on Fumo's behalf may not be officially unethical under the code of legal conduct, which specifically prohibits misleading a court but not the public.

But it sure seems underhanded and immoral to me.

…

But not every lawyer – or so you'd hope – would deliberately sell the public a bill of goods.

Lawyers are clearly prohibited from lying in court and in sworn testimony before, say, a legislature.

But lying in public "is not so clear," said Robert Tuttle, a professor of law at George Washington University Law School.

Still, it's not considered "honorable" behavior, said Tuttle, an expert on legal ethics.

"And," he said, "here's the important point:  It's not something that lawyers are expected to do in defense of your client."

Lawyers have no obligation to violate "ordinary moral standards on behalf of a client," Tuttle said.

When faced with an "awkward question," he said, "there's a big difference between deferring and deflecting a question and affirmatively lying.["]

"Even if it's not illegal, it suggests something about overstepping this role from somebody offering a lawful service to somebody who feels that their job is to protect this person at all costs."

So while Sprague may feel triumphant this week about being able to inflict damage on Fumo, he didn't do himself any favors, either.

Porter, "The law, duty & truth", Philadelphia Daily News, 2/20/09.  While Porter couches many of her statements as opinions, there are several explicit and implicit defamatory allegations of fact.  At the beginning of the article, Porter asserted that Attorney Sprague was "something of a liar."

The trial court held, and Appellees argue, that Attorney Sprague has not adduced sufficient evidence to establish that this allegation was false. A "liar" is defined as "[o]ne who tells lies." *Webster's II New College Dictionary*, (1995), at 631  A "lie" is defined as "a false statement purposely put forward as truth:  FALSEHOOD.  …  Something meant to deceive or give a wrong impression."  ***Id***., at 633.  Therefore, for Porter's allegation to be true, the statements by Attorney Sprague she was focusing on needed to be false.

The statements by Attorney Sprague at issue concern the same underlying allegation by Fumo that he had received legal advice from an attorney that he was permitted to delete e-mails after Citizen's had been subpoenaed but before he was personally subpoenaed or searched.  First, at the press conference, Attorney Sprague stated "Mr. Meehan knows that … Senator Fumo went and sought advice from a lawyer, not me, but a lawyer, whether he had to change his policy."  Transcript of the Press Conference of Richard A. Sprague, 2/8/07, transcribed 4/22/11, at 26.  The second statement was in the memorandum to the Senate Subcommittee:  "The government also ignored uncontroverted evidence of the Senator's reliance upon (albeit erroneous) legal advice for much of the relevant period."  Memorandum to Eric Tamarkin, from Sprague & Sprague, 11/21/07, at 10 n.12.

Appellees argue that Porter based her allegation that Attorney Sprague was a liar only upon the memorandum to the Subcommittee, and not his press conference. Even accepting this as true, which I believe constitutes inappropriately crediting Porter's testimony when reviewing Appellee's motion for summary judgment, I conclude that the record establishes, under any standard of proof, that Attorney Sprague's statement in the memorandum to the Subcommittee was not false. When Porter was questioned under oath, the following exchange occurred:

> Q.   Okay. Is it a true or false statement as far as you know from your thorough analysis of all of the information before writing this article that the government ignored, the government also ignored uncontroverted evidence of the Senator's reliance upon, albeit erroneous, legal advice for much of the relevant period? Is that true or false?
>
> A.   It's true as far as the literal interpretation of it.

N.T., Deposition of Jill Porter, 2/8/12, at 54-55. Thus, Porter has admitted that Attorney Sprague's statement was true. As a logical corollary, then, Attorney Sprague's statement could not be a lie, as it was not false. Granting this evidence all reasonable inferences, as we must at this stage of the litigation, there is certainly sufficient evidence of the falsity of Porter's article to satisfy any evidentiary burden placed upon Attorney Sprague.

The trial court also found that Porter's allegation that Attorney Sprague was "something of a liar" constituted nothing more than "a difference of opinion, based on disclosed facts, about whether it is morally acceptable for a lawyer to publicly lie on behalf of a client." Trial Court

Opinion, 11/1/13, at 29. Furthermore, the trial court added a footnote to this finding, noting that Attorney Sprague, acting in his professional capacity representing a client in court, had argued that allegations of lies constituted nothing more than non-actionable opinion. *See id*., n.12. These passages in the trial court's opinion reinforce my conclusion that the trial court fundamentally misapprehends the nature of this case. First, the trial court assumes that Attorney Sprague lied; I have already shown that Porter has admitted that he did not. Second, the footnote referencing Attorney Sprague's arguments in an unrelated case while representing a private client reveals that the trial court suffers from the same fundamental misunderstanding of the role of an attorney from which Porter suffered. That Sprague vigorously argued his client's legal position holds no bearing on Attorney Sprague's personal beliefs, let alone the current state of the law.

The trial court found that publishing an allegation that a public figure lied constitutes a statement of pure opinion that is non-actionable. In so doing, however, the trial court fails to cite any binding authority. Accordingly, I conclude that this finding by the trial court was also in error.[1]

_____

[1] It is worth noting that the U.S. Supreme Court has rejected the argument underlying the trial court's conclusion. The Court rejected the proposition that "a wholesale defamation exemption for anything that might be labeled 'opinion'" existed. *Milkovich*, 497 U.S. at 18. Rather, the Court observed that expressions of opinion often imply assertions of objective fact. *See id*.
*(Footnote Continued Next Page)*

Having established that the trial court erred in reviewing the record pursuant to the necessary standard, I will not extend this already long dissent by belaboring the other issues of falsity in Porter's article. I will merely summarize Attorney Sprague's additional argument relating to falsity. Attorney Sprague contends that he adduced sufficient evidence of record to establish that Porter deliberately misled Professor Tuttle. Furthermore, Attorney Sprague argues that Porter misused the Professor's quotes out of context in a manner that implied Professor Tuttle was opining that Attorney Sprague's conduct was "dishonorable." As Professor Tuttle has explicitly disclaimed any such opinion, I conclude that Attorney Sprague has also satisfied any evidentiary burden of establishing that this implicit allegation was also false.

Turning to the issue of actual malice, I begin by noting that at least on this issue, the trial court's opinion uses the appropriate burden of proof. Attorney Sprague bears the burden of establishing actual malice by clear and convincing evidence. However, I once again conclude that the trial court did not utilize the appropriate standard to review the evidence of record at the summary judgment stage. The Supreme Court of Pennsylvania has held

_(Footnote Continued)_ _____

"Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." **Id**., at 21. Finally, the Court discussed the hypothetical statement "I think Jones lied." The Court noted that if Jones had not lied, such a statement would serve as the basis of a defamation action. **See id**., at 20 n.7.

that the clear and convincing standard of proof is only relevant upon post-trial review of the record, not at the summary judgment stage. ***See Weaver v. Lancaster Newspapers, Inc.***, 926 A.2d 899, 908 (Pa. 2007). The only issue at the summary judgment phase is whether the plaintiff has adduced evidence capable of establishing a dispute of material fact. ***See id***.

To establish "actual malice," Attorney Sprague must adduce sufficient evidence to allow a fact-finder to conclude that the statement at issue was made "with knowledge that it was false or with reckless disregard of whether it was false or not." ***N.Y. Times Co. v. Sullivan***, 376 U.S. 254, 279-280. In determining whether actual malice has been established, the reviewing court must consider the entirety of the factual record. ***See Harte-Hanks Communications, Inc. v. Connaughton***, 491 U.S. 657, 688 (1989).

At her deposition, Porter testified that she did not know what part of Attorney Sprague's memorandum to the Subcommittee was false, nor did she know what evidence was in the government's possession when she wrote the article. ***See*** N.T., Deposition of Jill Porter, 2/8/12, at 61. Porter further admitted that she didn't investigate the truth of her allegation; she wasn't concerned with "trying to unearth evidence for or against" the literal truth of Attorney Sprague's statements. ***Id***., at 62.

While the trial court correctly notes that a lack of investigation is not enough, by itself, to constitute "actual malice," ***see Tucker***, 848 A.2d 113, 130, review of the record indicates to me that Attorney Sprague is not

relying solely upon the lack of investigation to establish "actual malice." The record as a whole reveals that Attorney Sprague has adduced significant evidence to establish that Porter purposely avoided the truth of her allegations. **See Harte-Hanks**, 491 U.S. at 692.

Here, as noted above, Attorney Sprague has adduced sufficient evidence to establish that "The law, duty & truth" contained false, defamatory statements. Also, as noted previously, Porter has testified that Sprague's statements were "true as far as the literal interpretation of it." Furthermore, the admittedly truthful literal interpretation, viewed in the context I set forth above concerning the role of an attorney, is sufficient evidence that Porter was alerted to the probability of the falsity of her allegations in "The law, duty & truth." Attorney Sprague clearly identified in both instances that he was communicating as Fumo's attorney, and that he was arguing for Fumo. His explicitly qualified statements, taken in context, were enough to establish that Porter knew he was not speaking for himself, but rather for his client. In this context, Porter's disdain for investigating the validity of her claims certainly gives rise to an inference that she was engaged in a "purposeful avoidance of the truth."

In addition, the record reveals that Professor Tuttle was not offering an opinion on the conduct of Attorney Sprague. **See** N.T., Deposition of Robert W. Tuttle, 1/7/13, at 37. Appellees contend that the article does not explicitly link Professor Tuttle's quotes to Attorney Sprague's conduct.

However, it is certainly fair to infer that the quotations were a direct comment on Attorney Sprague, as they were bracketed by paragraphs attacking Attorney Sprague's character. Thus, I conclude that the trial court's laser-like focus on evidence of lack of investigation ignored the abundant evidence in the rest of the record that could support a finding of "actual malice."

Regarding the final ground for the trial court's dismissal of Attorney Sprague's defamation claim, I conclude that the trial court has again misapplied the law. Initially, the trial court concludes that Attorney Sprague cannot have suffered damages since it found that the allegations in the article were true. As noted above, the trial court's conclusion was erroneous, and therefore this cannot be a basis for concluding that Attorney Sprague suffered no damages.

Next, the trial court concludes that Pennsylvania law requires a showing of damage to the defamation plaintiff's reputation. However, this conclusion is not an accurate description of Pennsylvania law. A panel of this Court has recently observed:

> [I]n addition to evidence of reputational harm, personal humiliation and mental anguish are types of actual harm… compensable for defamation. ***Pilchesky***, 12 A.3d at 444. ***See also Brinich***, 757 A.2d at 397 (quoting Restatement (Second) of Torts § 621, Comment at b.); 50 Am.Jur.2d Libel and Slander § 358 ("[G]eneral damages … represent such effects of the defamation as … shame mortification, and hurt feelings[.]")

*Joseph v. The Scranton Times, L.P.*, 89 A.3d 251, 265-266 (Pa. Super. 2014) (*Joseph II*). The panel in *Joseph II* reversed the trial court as the panel concluded that the trial court had not considered evidence of non-reputational damages in reaching its non-jury verdict. *See id*., at 266. Thus, the trial court is incorrect in finding that Attorney Sprague was required to adduce evidence of damage to his reputation.

In its other alternative theory in support of dismissal, the trial court asserts that Attorney Sprague was required to present expert testimony regarding his mental and emotional injuries. First, I note that the authority relied upon by the trial court, *Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988 (Pa. 1987), did not concern defamation at all; rather, it concerned the tort of intentional infliction of severe emotional distress. As such, it certainly should not be relied upon in summarily dismissing Attorney Sprague's arguments to the contrary. Importantly, this Court has consistently held, contrary to the trial court's summary dismissal, that a plaintiff's own testimony concerning emotional harm is sufficient to prove compensable damages. *Joseph II*, 89 A.3d at 266 (summarizing lay testimony of emotional harm and concluding that trial court erred in not considering such testimony in reaching non-jury verdict); *Joseph I*, 959 A.2d , 322, 345 ("plaintiff's testimony concerning damage to reputation and emotional harm was sufficient to prove compensable damages"); *Wilson v. Benjamin*, 481 A.2d 328, 333 (Pa. Super. 1984) (plaintiffs' testimony to

- 27 -

reputational injury and emotional distress sufficient to establish damages in defamation).

Finally, turning to the trial court's dismissal of Attorney Sprague's invasion of privacy – false light claim, I note that I have already set forth why I disagree with the trial court's primary reasoning. The trial court correctly recognized that the First Amendment jurisprudence elucidated by **N.Y. Times** and its progeny apply to false light claims. However, as noted above, I conclude that the trial court erred in its application of the applicable standards. For the same reasons as set forth above, I conclude that the trial court erred in holding that the First Amendment bars relief on Attorney Sprague's false light claim.

In the alternative, the trial court held that the record cannot support a false light claim. The trial court based this result on its conclusion that false light claims cannot be premised upon the publication of public facts about the plaintiff, citing **Strickland v. University of Scranton**, 700 A.2d 979 (Pa. Super. 1997). I agree with the trial court that **Strickland** certainly stands for that proposition. However, I note that it is, unfortunately, far from clear that **Strickland** represents the law of Pennsylvania on this matter. As Appellees argue, in their brief on appeal, prior decisions of the Superior Court are binding precedent on a subsequent three-judge panel of this Court. **See Commonwealth v. Hull**, 705 A.2d 911, 912 (Pa. Super. 1998). Thus, the **Strickland** panel had no authority to overrule **Larsen v.**

***Philadelphia Newspapers, Inc.***, 543 A.2d 1181, 1189 (Pa. Super. 1988), which stated "that recovery in tort for the disclosure of public, as well as private, facts, even though they be true, is warranted to protect a claimant's right to be free from being placed in a false light...." Thus, I conclude that the trial court misapplied the law when it held that the record could not support Attorney Sprague's false light claim.[2]

For all these reasons, I would reverse the trial court's order, and I therefore dissent from the majority's affirmance on the basis of the trial court's opinion.

_____

[2] I further observe that the Supreme Court of Pennsylvania granted a petition of allowance of appeal to address the following issue: "Does Pennsylvania recognize a cause of action for false light invasion of privacy by an elected official for publications discussing her public, not private, actions?" ***Krajewski v. Gusoff***, 74 A.3d 119 (Pa. 2013) (Order). However, that appeal was subsequently dismissed as moot. ***See Krajewski v. Gusoff***, 84 A.3d 1057 (Pa. 2014) (Order).